## IN RE JESSICA B.*
### (AC 17332)

Schaller, Hennessy and Sullivan, Js.

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued February 27—officially released September 29, 1998

*Russell L. Case*, for the appellant (respondent mother).

*Jane R. Rosenberg*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Susan T. Pearlman* and *Linda Pearce Prestley*, assistant attorneys general, for the appellee (petitioner).

*Dale H. King*, for the minor child.

*Opinion*

HENNESSY, J. The respondent mother (respondent)[1] of Jessica B. appeals from the judgment of the trial court terminating her parental rights with respect to

---

[1] The respondent is mentally retarded and, consequently, had a guardian ad litem appointed on July 7, 1990, in an unrelated proceeding, who, as is apparent from the record, has remained in such position until the present time.

Jessica. The respondent claims that the trial court improperly (1) found that the evidence was sufficient to prove that the respondent failed to achieve rehabilitation and is unlikely to do so within a reasonable time, (2) found that the department of children and families (department) made reasonable efforts to reunite the child with the respondent, (3) admitted into evidence, as party admissions, out-of-court statements made by the respondent and (4) denied the respondent's motion for a mistrial. We affirm the judgment of the trial court.

The following facts and procedural history are relevant to this appeal. This matter came before the trial court by a petition filed by the department on January 18, 1996, requesting the termination of the parental rights of the respondent parents with respect to Jessica pursuant to General Statutes (Rev. to 1995) § 17a-112, as amended by Public Acts 1995, No. 95-238, § 3.[2] The

[2] General Statutes (Rev. to 1995) § 17a-112, as amended by Public Acts 1995, No. 95-238, § 3 (effective October 1, 1995), provides in relevant part: "(a) In respect to any child committed to the commissioner of children and families in accordance with § 46b-129, either the commissioner, or the attorney who represented such child in the prior commitment proceeding, or an attorney appointed by the superior court on its own motion, or an attorney retained by such child after attaining the age of fourteen may petition the court for the termination of parental rights with reference to such child . . . .

"(b) The superior court upon hearing and notice, as provided in sections 45a-716 and 45a-717, may grant such petition if it finds that the Department of Children and Families has made reasonable efforts to reunify the child with the parent and, upon clear and convincing evidence, that the termination is in the best interest of the child and that . . . over an extended period of time, which . . . shall not be less than one year: (1) The child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child; or (2) the parent of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . or (4) there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs

department alleged the following statutory grounds with respect to both parents: abandonment pursuant to § 17a-112 (b) (1), now § 17a-112 (c) (3) (A); failure to achieve rehabilitation pursuant to § 17a-112 (b) (2), now § 17a-112 (c) (3) (B); and no ongoing parent-child relationship pursuant to § 17a-112 (b) (4), now § 17a-112 (c) (3) (D). The department also alleged, in accordance with the statute, that each of these grounds for termination had existed for more than one year. See General Statutes (Rev. to 1995)[3] § 17a-112 (b), now § 17a-112 (c) (3).

Hearings were held before the trial court on various dates between October 8, 1996, and March 27, 1997, and the court found that the department had proven, by clear and convincing evidence, that the respondent had failed to achieve personal rehabilitation and that she was unlikely to do so within a reasonable time in the future as set forth in General Statutes (Rev. to 1995) § 17a-112 (b) (2), now § 17a-112 (c) (3) (B). The trial court then terminated the parental rights of the respondent, finding that it was in the best interest of Jessica. It is from that judgment that the respondent takes this appeal.[4]

Jessica was born on September 24, 1993, at the Backus Hospital in Norwich. After the child was delivered, the hospital staff obtained a ninety-six hour hold[5]

of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child. . . ."

[3] References in this opinion to the statutory revision to 1995 indicate that those sections were not affected by Public Acts 1995, No. 95-238.

[4] The parental rights of Jessica's father were also terminated with respect to Jessica in this proceeding. This appeal concerns only the respondent mother.

[5] This ninety-six hour hold was in accordance with General Statutes (Rev. to 1993) § 17a-101 (d), which provides in relevant part: "Any physician examining a child with respect to whom abuse is suspected shall . . . have the right to keep such child in the custody of a hospital for no longer than ninety-six hours, and may perform diagnostic tests and procedures necessary

on Jessica's custody. On September 28, 1993, the department requested, and the court granted, an ex parte order of temporary custody. At that time, the department also filed a petition alleging neglect. Jessica was placed in a foster home, where she has remained continuously through the present.

On June 15, 1994, the trial court found the child to be neglected and committed her to the department for a period not to exceed eighteen months.[6] At that hearing, the trial court set the following expectations with respect to the respondent: "keep her whereabouts known to [the department] and her counsel, visit [Jessica] as often as the department permits, participate in individual counseling, obtain assessments and tests necessary for department of mental retardation services, secure and maintain adequate housing and income, refrain from substance abuse and involvement with the criminal justice system, and cooperate with services offered or referred to her by [the department] including patient aid services." A list of those expectations was signed by the respondent, her guardian ad litem and her counsel. A year and one-half later, on January 18, 1996, the department filed termination petitions alleging, inter alia, that the respondent had failed to rehabilitate herself.

In its written memorandum of decision, the trial court found the following facts on which it relied. The respondent has an intelligence quotient of fifty-nine and is mildly to moderately mentally retarded. She has great difficulty reading and writing. Evaluations of the

_____

to the detection of child abuse with or without the consent of his parents, guardian or other person having responsibility for his care . . . ." See General Statutes (Rev. to 1997) § 17a-101f.

[6] This commitment was extended by the court on December 11, 1995. On December 18, 1996, a hearing was held before the trial court, at which the parties, through counsel, agreed to an additional one year extension of commitment, pending the outcome of the termination proceeding and without prejudice to any party.

respondent were conducted by Bruce Freedman, an evaluator appointed by the court, between November 8, 1993, and April 30, 1996. Freedman, a licensed clinical psychologist, noted the following in his various evaluations of the respondent. The respondent is mentally retarded in the mild to moderate range; she has mental limitations that would affect her ability to manage both daily tasks and parenting skills; she shows poor judgment in men because she is unable to be without a man; each man she has chosen had appeared to be irresponsible, physically abusive, neglectful at times and has eventually abandoned her. Freedman concluded that "[o]n her own, [the respondent] would not have the common sense, intelligence and judgment to care for herself and her basic needs, or to provide for a growing child."

Freedman found, and the trial court agreed, that the only way in which the respondent could adequately care for Jessica would be if she established a permanent living arrangement with another adult who would serve as Jessica's primary caregiver. Freedman concluded, however, that the respondent's then spouse was not qualified to fill that role and, further, that the respondent would be unable to protect Jessica from him. During the trial, Freedman testified that the respondent's spouse is a "potentially dangerous individual" and that he displays signs of an antisocial personality disorder.

The standard of review for claims challenging the finding of a trial court in a juvenile proceeding is well established. "On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached . . . nor do we retry the case or pass upon the credibility of the witnesses. . . . Rather, on review by this court every reasonable presumption is made in favor of the trial court's ruling." (Citations omitted; internal quota-

tion marks omitted.) *In re Christina V.*, 38 Conn. App. 214, 220, 660 A.2d 863 (1995).

## I

The respondent initially claims that the trial court improperly found that she had failed to achieve rehabilitation and that she is unlikely to do so within a reasonable time.[7] The respondent specifically challenges the trial court's conclusion arguing that it is not legally correct or factually supported by the record. We are not persuaded.

" 'Personal rehabilitation' as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. The unamended statute sets no particular time limit as to when a parent must be able to assume again a responsible position in the life of his or her child. *In re Juvenile Appeal (84-3)*, [1 Conn. App. 463, 477, 473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984)]. Nor does it require the parent to be able to assume full responsibility for a child, without the use of available support programs. Id." *In re Migdalia M.*, 6 Conn. App. 194, 203, 504 A.2d 533, cert. denied, 199 Conn. 809, 508 A.2d 770 (1986).

The respondent challenges the trial court's finding that she failed to achieve rehabilitation because the following evidence presented at trial would support the opposite conclusion: (1) the respondent currently serves as the primary caretaker for one of her children;

---

[7] At the time the petition to terminate the parental rights of the respondent was filed, January 18, 1996, the statute in effect regarding failure to achieve rehabilitation was General Statutes (Rev. to 1995) § 17a-112 (b) (2), which provides for termination of parental rights when "the parent of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ." See General Statutes (Rev. to 1997) § 17a-112 (c) (3) (B).

(2) the respondent and her husband have established a home in New Bedford, Massachusetts; (3) her mental retardation does not render her unable to provide Jessica with the necessary care because she is allegedly serving as the full-time primary caretaker for another child.[8]

The trial court placed great weight on a series of facts that present a picture of the respondent far different from one based solely on the three facts on which she relies. First, the respondent's current living arrangements are not acceptable, considering the housemates that would have access to Jessica. Her husband[9] was convicted of sexually abusing a six year old child in 1989, for which he served three years and for which he is currently on probation. A friend of the respondent and her husband lives on the third floor of the respondent's home. He was convicted of various burglaries and larcenies, reckless endangerment and one count of risk of injury to a child. The house in which they all live is equipped with an extensive electronic intercom system so that her husband and his friend can assist the respondent with the care of her other daughter, indicating that these two adults are the respondent's parental support system. As noted several times by the trial court, it is her choice of support system that undermines her ability to achieve rehabilitation.

---

[8] The trial court found that "[d]uring the trial, [the respondent's husband], his mother and [another witness] also testified on behalf of the respondent that [she] was independently capable of caring for Jessica. In summary, three witnesses claimed during their testimony that the respondent successfully cares for her [other] daughter and could appropriately function as Jessica's primary caretaker. *The court ascribes little weight to that testimony. As noted above, the court has accepted Dr. Freedman's professional opinion that [the respondent] would be unable, by herself, to appropriately care for a child of any age.*" (Emphasis added.)

[9] The respondent on May 3, 1994, married her husband, with whom she has a daughter, born on October 3, 1995, who is currently in the custody of the respondent.

Second, regarding the respondent's visitation with Jessica, for the first two years the respondent visited regularly. During the first two years of visitation, the trial court found that during some of the visits, the respondent exhibited appropriate handling of Jessica. During other visits, however, her behavior reflected the "lack of judgment, common sense and parenting skills to which Freedman referred in his evaluations."[10] It is also important to note that from May, 1995, until the end of October, 1995, she failed to visit Jessica at all.[11]

Third, regarding social services, the department sent the respondent and her husband information regarding social services available in New Bedford, Massachusetts. In October, 1994, the respondent requested that the department initiate an interstate compact study through the Massachusetts child welfare agency in order for them to examine the possibility of granting custody of Jessica to the respondent and her husband. The department initially agreed to this proposal, but reversed its position upon learning that the respondent's husband had been convicted of risk of injury to a child on the basis of an allegation that he had sexually molested a child. Further, there was no evidence that the respondent availed herself of the counseling and

[10] Examples include: On March 2, 1994, the respondent put her fingers, which appeared to have dried blood on them, into Jessica's mouth; on May 23, 1994, the respondent brought a bottle of spoiled milk with her and attempted to feed it to Jessica; on September 13, 1994, in response to eleven month old Jessica's crying, the respondent called her a "shithead" and told her to "knock off the attitude." The trial court found that there were additional entries that detailed similar instances.

[11] A department worker testified that the respondent's husband informed her that the respondent was unable to travel due to difficulties with her pregnancy and that this restriction was from her physician. The respondent's husband, who testified that he holds power of attorney for the respondent, promised to forward the information to the department so that they could transport Jessica to New Bedford. The social worker contacted the respondent's physician, who informed her that no such restrictions had been placed on the respondent.

parenting classes available to her in New Bedford, nor did her husband avail himself of the counseling recommended by the department.

Finally, the trial court concluded that "there have been acts of domestic violence between [the respondent and her husband]." The respondent informed a social worker that her husband had hit her. Her husband denied allegations of domestic violence and testified that he did not hit her; rather, the respondent had become so enraged at times that he had to restrain her to prevent her from harming herself, him or her other child.

The trial court found that the respondent's ability to achieve rehabilitation successfully hinged on her ability to "establish a competent parental and personal support system. This might have been accomplished through a congregate or group living program, or through her association with one or more responsible adults to provide for Jessica's primary care." Freedman found, and the trial court concluded, that the respondent's husband was not qualified to serve as the respondent's support system, specifically, the adult who would provide the primary care for Jessica. The trial court further found that the support system established by the respondent is inappropriate and has prevented her from "achieving the requisite parental rehabilitation."

As to the particular expectations previously set, the trial court found that the respondent's husband is not likely to cooperate with social services' attempts to assist the respondent, he exhibits great control over the respondent's decisions and the respondent has failed to follow through with social services in Massachusetts. On the basis of those findings, the trial court concluded that the respondent had failed to achieve rehabilitation. The trial court further found that the respondent was unlikely to achieve rehabilitation within a reasonable

time in the future because her commitment to her husband, who is adamantly opposed to the assistance of social services, would preclude her rehabilitation.

As part of her argument related to the trial court's finding of failure to achieve rehabilitation, the respondent states the following in her brief: "[The respondent] has mental retardation. That's something she has no control over. And, clearly, that's not a reason for termination of parental rights unless it 'renders her unable to provide the child with necessary care.' *In re Nicolina T.*, [9 Conn. App. 598, 605, 520 A.2d 639, cert. denied, 203 Conn. 804, 525 A.2d 519 (1987)] . . . . But in this case there was ample evidence that she is now able to take care of a child. In fact, she has been doing so for more than a year now in New Bedford." We note that the trial court's finding that the respondent had failed to achieve rehabilitation was *not* based on her mental retardation; it was properly based on her inability to meet the court-approved expectations. Those expectations were intended to assist the respondent in the creation of an adult support network. Furthermore, the assertion that the respondent was successfully caring for her other child is not supported by the record.

Although the respondent's condition of mental retardation did not change over the years, it is not her disability that we must consider. The proper inquiry for this court is the respondent's "conduct and relationship to her children, and not her status as a mentally [retarded] person . . . ." Id., 607. In this case, we agree with the trial court's conclusion that to parent successfully, the respondent requires a support system that will enable her to provide for Jessica adequately. It is apparent from the evaluations of Freedman that this support system must include another adult in the home who could assume primary responsibility for Jessica's care.

There was testimony that the respondent was an extremely dependent person who would require the help of another adult to manage a child and her own life outside of a sheltered living situation. That, coupled with the testimony that the respondent's husband, on whom she depends, is not an adequate helper and discourages outside help, lends support for the trial court's conclusion that the respondent has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, she could assume a responsible position in the life of the child.

## II

The respondent next claims that the trial court improperly found that the department undertook reasonable efforts to reunite Jessica with the respondent and, in the alternative, that due to her disability, she was entitled to greater services. In response, the department argues that on the basis of the evidence, the trial court properly found that the department had made reasonable efforts to reunify the respondent and Jessica pursuant to General Statutes (Rev. to 1995) § 17a-112 (b), as amended by Public Acts 1995, No. 95-238, § 3, now § 17a-112 (c) (1).[12] We affirm the judgment of the trial court.

Before a termination of parental rights can be granted, the trial court must be convinced that the department has made reasonable efforts to reunite the child with his or her family. The term "reasonable efforts" was recently addressed by this court: "Turning to the statutory scheme encompassing the termination of the parental rights of a child committed to the department, the statute imposes on the department the duty, inter alia, to make reasonable efforts to reunite the child or children with the parents. The word reasonable is the linchpin on which the department's efforts in a

---

[12] See footnote 2.

particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. Neither the word 'reasonable' nor the word 'efforts' is, however, defined by our legislature or by the federal act from which the requirement was drawn. . . . [R]easonable efforts means doing everything reasonable, not everything possible." *In re Eden F.*, 48 Conn. App. 290, 311–12, 710 A.2d 771, cert. granted on other grounds, 245 Conn. 917, 717 A.2d 234 (1998). The trial court's ruling on this issue should not be disturbed on appeal unless, in light of the evidence in the entire record, it is clearly erroneous. *In re Tabitha P.*, 39 Conn. App. 353, 361, 664 A.2d 1168 (1995).

A

The respondent claims that the department failed to make reasonable efforts to reunite the respondent with her child.[13] In response, the department asserts that it made all reasonable efforts to achieve reunification and, under the circumstances, in particular the fact that the respondent had moved out of state, complied with its statutory obligation. We agree with the department.

The following facts were before the trial court and are necessary to the resolution of this issue. General Statutes § 17a-112 requires that prior to granting a petition for termination, reasonable efforts to reunite the parent and child be undertaken.[14] To that end, before

---

[13] The respondent concedes that her "move to New Bedford greatly minimized [the department's] ability to monitor [the respondent's] situation and provide her with supportive services." Therefore, her argument that the department failed to make reasonable efforts will be reviewed with that in mind.

[14] General Statutes (Rev. to 1995) § 17a-112 (b), as amended by Public Acts 1995, No. 95-238, § 3, provides in relevant part: "The superior court upon hearing and notice, as provided in sections 45a-716 and 45a-717, may grant such petition if it finds that the department of children and families has made reasonable efforts to reunify the child with the parent and, upon clear and convincing evidence, that the termination is in the best interest of the child . . . ." See General Statutes (Rev. to 1997) § 17a-112 (c) (1).

the respondent removed herself from the state, the department arranged transportation for the respondent's weekly visits and for social service assistance during those visits.

Additionally, the department arranged for social services assistance with a parent aide program and the department of mental retardation. The respondent's relocation to Massachusetts, however, interfered with the implementation of these programs.[15] After the respondent moved out of state, the department continued to contact her and attempted to assist her. Mary Dunion, a social worker assigned to the respondent's case, wrote a letter to the respondent informing her of parent support groups and counseling in her town. The respondent was also told about the Massachusetts department of mental retardation, which could provide additional assistance. In response to his request, Dunion provided the respondent's husband with the names of several treatment centers for sex offenders.

The respondent argues the following: Had the department agreed to an interstate compact, she could have had available to her a range of services in Massachusetts where she was living, which would have enabled her to be united with her child; letters sent by the department

General Statutes (Rev. to 1995) § 17a-112 (d) provides in relevant part: "[I]n determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered or provided to the parent and the child by an agency to facilitate the reunion of the child with the parent . . . ." See General Statutes (Rev. to 1997) § 17a-112 (e) (1).

[15] In January, 1994, the department referred the respondent to the New London County parent aide program. Typically, a parent is put on a waiting list for a few months prior to receiving assistance. The respondent delayed in applying for this program and at the time an aide became available, the respondent had relocated to Massachusetts. Similarly, the department referred the respondent to the Connecticut department of mental retardation. Before the department could implement assistance based on the respondent's April, 1994 neurological evaluation, however, she had relocated to Massachusetts.

listing agencies in Massachusetts, which could have helped her reunite her with her child, confused her and her husband so that the letters were of no help; the department did not follow up on an offer of a relative placement and never provided her with a protective setting in which another caretaker was available.

The record of the proceedings in the trial court belies these claims. The trial court found that the department had initially agreed to request that the Massachusetts child welfare agency conduct a study of the respondent's home situation in order to decide if the child could be reunited with the respondent with proper support services. The department changed its position, however, when it found that the respondent's husband, who would be residing in the household, had been convicted of risk of injury to a child. The respondent appealed from that decision, which was upheld at the administrative hearing on the matter; the respondent did not appeal the administrative decision.

Despite the department's decision not to initiate an interstate compact evaluation, the respondent could have sought out the assistance of Massachusetts social services. The record clearly shows that the department corresponded by mail with the respondent and her husband, directing the couple to rehabilitative services in Massachusetts. Neither the respondent nor her husband followed through to engage any support from these agencies.

Furthermore, in an effort to continue visitation, the department offered to transport the child to the respondent in Massachusetts for their scheduled visits if the respondent would provide the department with medical confirmation of problems related to her pregnancy. The confirmation requested was never received and, therefore, the department dropped the plan to transport the

child to Massachusetts for visitation with the respondent. See footnote 7.

As to the respondent's allegation that the department did not make efforts to relocate the child with family members, the record is to the contrary. The department investigated placing Jessica with the respondent's mother, sister, brother and Jessica's father. The respondent's mother indicated that she did not want to take custody of Jessica, and the department rejected placing Jessica with the respondent's sister due to her long history of neglect. The respondent's brother offered to care for Jessica. This offer was rejected, however, on the ground that it would not be in the best interest of the child to leave the family with whom she had been living since her birth and move to Florida to live with a family she had never seen. As to Jessica's father, after the department initially contacted him regarding the placement of Jessica, he failed to communicate with the department.

The court properly found that the department made reasonable efforts to reunify through arranging for visitation and providing information for the respondent and her husband about agencies that could help them in providing the proper structure and environment for the child. "[W]hether reasonable efforts have been proven depends on the careful consideration of the circumstances of each individual case." *In re Eden F.*, supra, 48 Conn. App. 312. We conclude that under the circumstances of this case, the department made reasonable efforts to reunite the respondent with Jessica. The trial court's conclusion is supported by the record.

### B

The related argument presented by the respondent is that pursuant to General Statutes § 46a-7[16] and article

[16] General Statutes § 46a-7 provides: "It is hereby found that the state of Connecticut has a special responsibility for the care, treatment, education,

twenty-one of the amendments to the Connecticut constitution,[17] the department is required to provide persons with a mental disability a *greater* level of services than those offered to parents without a mental disability. This issue was not raised before the trial court, was not raised pursuant to the plain error doctrine on appeal, nor adequately briefed. Accordingly, we decline to review this claim. See *State* v. *Henderson*, 47 Conn. App. 542, 558, 706 A.2d 480, cert denied, 244 Conn. 908, 713 A.2d 829 (1998); *State* v. *Teel*, 42 Conn. App. 500, 504, 681 A.2d 974, cert. denied, 239 Conn. 921, 682 A.2d 1012 (1996); *State* v. *Harrison*, 34 Conn. App. 473, 487, 642 A.2d 36, cert. denied, 231 Conn. 907, 648 A.2d 157 (1994).

## III

The respondent next argues that the trial court improperly admitted her out-of-court statement as an exception to the hearsay rule for admissions by a party and that such admission constituted prejudicial abuse of discretion requiring reversal. We do not agree.

Additional facts are necessary to resolve this claim. During the contested hearing, Dunion testified that in November, 1995, the respondent stated that her husband had hit her. This portion of Dunion's testimony was objected to by the respondent as hearsay. The trial court overruled the objection on the basis that the respondent's statement fell within the admission by a party opponent exception to the hearsay rule.

rehabilitation of and advocacy for its disabled citizens. Frequently the disabled are not aware of services or are unable to gain access to the appropriate facilities or services. It is hereby the declared policy of the state to provide for coordination of services for the disabled among the various agencies of the state charged with the responsibility for the care, treatment, education and rehabilitation of the disabled."

[17] Article first, § 20, of the constitution of Connecticut, as amended by article twenty-one of the amendments, provides in relevant part: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of . . . mental disability."

The respondent does not contest the rule that an admission by a party opponent is generally admissible as an exception to the hearsay rule. See *O'Brien* v. *John Hancock Mutual Life Ins. Co.*, 143 Conn. 25, 29–30, 119 A.2d 329 (1955); *Cashman* v. *Terminal Taxi Co.*, 131 Conn. 31, 33, 37 A.2d 613 (1944); C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) §§ 11.5 and 11.6. Nor does she contest the proposition that in juvenile proceedings, the formal rules of evidence are given a "liberal interpretation." *In re Cynthia A.*, 8 Conn. App. 656, 662, 514 A.2d 360 (1986).

On appeal, the respondent alleges that this statement, as an admission of a party opponent, is admissible only if there is a sufficient probability that the statement is reliable and trustworthy. In support of her argument, she relies on *State* v. *Stepney*, 191 Conn. 233, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772 (1984). In particular, the respondent cites to that portion of *Stepney* that states "[t]hough generally inadmissible, hearsay may be admitted if there is a sufficient probability that the statement is reliable and trustworthy . . . ." Id., 249. Reliance on that portion of *Stepney* as a basis for admissibility as an admission of a party opponent is, however, somewhat misplaced.

*Stepney* goes on to state that "[s]ome types of admissible hearsay occur frequently enough that certain defined exceptions to the general rule of inadmissibility have come to be recognized. Among the recognized exceptions to the hearsay exclusionary rule is that for admissions of a party." Id., 250.[18] "The statements made

---

[18] It is interesting to note that *Stepney* relies on C. Tait & J. LaPlante, supra, § 11.5, which states that "admissions should be clearly distinguished from declarations against interest. See infra § 11.6. Although a statement by a party-opponent might also qualify as a declaration against interest, it should always be offered as an admission to avoid the technicalities of a declaration against interest." Id., § 11.5, p. 331. Section 11.6 of the treatise makes it clear that "[d]eclarations against interest are admissible as a hearsay

out of court by a party-opponent are *universally deemed admissible* when offered against him . . . so long as they are *relevant and material to issues in the case*. Although the theories for admissibility differ, the vast weight of authority, judicial, legislative, and scholarly, supports the admissibility *without restriction* of any statement of a party offered against that party at trial." (Citation omitted; emphasis added; internal quotation marks omitted.) Id., 251. Potential issues regarding the trustworthiness of the statement may be addressed by the rule that "[w]here evidence is introduced showing an apparent admission of a party out of court, [she] is entitled to explain the circumstances so that the trier can properly evaluate it." (Internal quotation marks omitted.) *Kucza* v. *Stone*, 155 Conn. 194, 198, 230 A.2d 559 (1967).

The trial court, in the exercise of its broad discretion in ruling on evidentiary matters, did not abuse that discretion in allowing the respondent's admission into evidence as an admission of a party opponent.

## IV

The respondent claims that the trial court improperly denied her motion for a mistrial once her competency was at issue. The respondent claims that *In re Alexander V.*, 223 Conn. 557, 566, 613 A.2d 780 (1992), requires that in a case such as this, a competency hearing must be conducted before the termination trial begins or, if it is not so conducted, that the court declare a mistrial.[19] In response, the department argues that the due process rights of the respondent were adequately protected and the trial court properly denied the respondent's motion. We agree with the department.

---

exception if the following requirements are met . . . (4) the statement is trustworthy. *Ferguson* v. *Smazer*, 151 Conn. 226, 232–34, 196 A.2d 432 (1963)." C. Tait & J. LaPlante, supra, § 11.6, pp. 348–49.

[19] This court has carefully read that portion of *In re Alexander V.* cited by the respondent. That case does not support the proposition set forth in the respondent's brief.

The following additional facts are necessary to address this issue fully. After the contested hearing commenced and the trial court had received the testimony of two witnesses, Freedman and Dunion, the trial court engaged in a discussion with counsel and the guardian ad litem and ordered, sua sponte, psychiatric evaluation of the respondent. The trial court ordered this evaluation to determine the respondent's competency to understand the nature of the proceedings and her ability to assist her counsel effectively.

The trial court appointed Walter Borden, a psychiatrist, to conduct two evaluations. After the first evaluation, Borden reported to the trial court that "[the respondent] does have an understanding of her legal situation. That is, she understands she faces a hearing where her parental rights of her daughter, Jessica, might be terminated. She also understands that allegations have been made against her concerning her ability to take care of Jessica and she understands other allegations have been made against her husband in regard to his criminal record. She also has an understanding of the court proceedings and the roles of the parties involved." Despite the respondent's understanding of the proceeding, Borden noted that "in a joint interview with her attorney, however, it did appear that her ability to respond to his questions and to assist him effectively is limited. . . . [The respondent] on her own is not fully competent to assist counsel during the upcoming hearing. However, with the assistance of her mother-in-law or someone who can take a similar assisting role, it is possible that competence could be achieved."

Upon hearing this report, the trial court investigated persons who potentially could explain the proceedings to the respondent. It was determined that the respondent's mother-in-law was appropriate. She, however, declined to be evaluated or to continue attending the court proceedings because she suffered from panic

attacks. The psychiatrist then interviewed the respondent's husband and their housemate, whom the respondent referred to as "brother." These two men presented themselves as those closest to the respondent and available to help her through the court proceedings.

Borden concluded that neither the respondent's husband nor their friend would be appropriate to help guide the respondent through the court proceedings, and that "it is probable that [the respondent] would not be competent even if outside assistance was obtained because her residence in that household places her under the domination of her husband. . . . That fact alone would substantially interfere in her being able to take independent action in terms of participating in court proceedings regarding her own and her child's best interest. Her mental retardation involves such suggestibility and inability to take independent action that the family influences constitute a major obstacle."

Thereafter, the respondent moved for a mistrial on the ground that two key witnesses, Freedman, who had evaluated the respondent and her husband, and Dunion, a social worker with the department, had testified before the respondent had been adjudged incompetent. The respondent argued that without proper assistance she would be incapable of assisting her attorney in the preparation of her defense.

The trial court denied the motion for mistrial and ordered that all counsel be supplied with transcripts of the testimony already received into evidence during the trial and that it would allow liberal recesses of the hearing whenever the guardian ad litem felt that the circumstances required her to make explanations to the respondent or otherwise to facilitate her ability to understand the proceedings and to assist her counsel. The court further advised the respondent that the witnesses who had testified before the evaluation was conducted could be recalled later in the proceedings. The

trial court informed the respondent's counsel and guardian ad litem that they should feel free, during the course of the trial, to suggest any other accommodations or methods that they believed would help protect the respondent's due process rights and enhance her ability to participate in the hearing.

We are aware that this issue requires significant consideration in light of the rule that "[t]he right of a parent to raise his or her children has been recognized as a basic constitutional right. *Stanley* v. *Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972); *Lehrer* v. *Davis*, 214 Conn. 232, 236, 571 A.2d 691 (1990). Accordingly, it has been held that the due process clause of the fourteenth amendment to the United States constitution applies when a state seeks to terminate the relationship between parent and child. *Lassiter* v. *Department of Social Services*, 452 U.S. 18, 27, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981)." *In re Alexander V.*, supra, 223 Conn. 560.

We conclude that the trial court adequately addressed the mandate of the fourteenth amendment when faced with testimony of specific factual allegations that, if true, constituted substantial evidence raising a reasonable doubt about the respondent's competency. See *State* v. *Wolff*, 237 Conn. 633, 666, 678 A.2d 1369 (1996). This was evident when it exercised its discretion, sua sponte, to order a psychiatric evaluation of the respondent. Once the trial court was persuaded, on the basis of the testimony of the court-appointed psychiatrist, that the respondent was in fact incompetent, it was in a position to determine the most appropriate and beneficial course of action to meet the requirements of due process. The trial court, aware of the potential due process implications, made all reasonable efforts to reduce the risk that the parental rights of the respondent might be erroneously terminated. To that end, it made available to the respondent's attorney and guardian ad

litem, at state expense, full transcripts of all testimony given prior to the evaluation of the respondent. The witnesses who had testified prior to the evaluation were allowed to be recalled if the respondent chose to do so. Adequate time was allowed for the respondent, the guardian ad litem and the respondent's attorney to recess or interrupt the proceedings to explain matters to the respondent or to answer her questions. In fact, the trial court urged the parties to make the court aware of any further accommodations that they felt would add to the respondent's understanding of the proceedings.

A mistrial should be granted "only if something occurs in the course of the trial that makes it apparent to the court that a party cannot have a fair trial and the whole proceedings are vitiated." *State* v. *Lucci*, 25 Conn. App. 334, 341, 595 A.2d 361, cert. denied, 220 Conn. 913, 597 A.2d 336 (1991). Accordingly, "[o]n appeal, we hesitate to disturb a decision not to declare a mistrial. The trial judge is the arbiter of the many circumstances which may arise during the trial in which his function is to assure a fair and just outcome." (Internal quotation marks omitted.) *State* v. *Bowman*, 46 Conn. App. 131, 136, 698 A.2d 908 (1997). "If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided. . . . *State* v. *Wooten*, [227 Conn. 677, 694, 631 A.2d 271 (1993)]." (Internal quotation marks omitted.) *State* v. *Bowman*, supra, 136.

We are convinced that the measures taken by the trial court to protect the rights of the respondent were appropriate and adequate. The respondent's attorney and guardian ad litem were present during the testimony of the witnesses who testified during the period before the evaluation and were instructed numerous times that if they felt that recalling those witnesses would aid them in the respondent's defense they were welcome to do so. There was no evidence presented that the respondent was prejudiced in any manner by

the witnesses' testifying prior to the evaluation and our review of the record does not support such a conclusion.

The respondent's motion for a mistrial was properly denied by the trial court. The trial court did not abuse its discretion in denying the motion.

The judgment is affirmed.

In this opinion the other judges concurred.