MEMORANDUM OF DECISION
On February 1, 1999, the Department of Children and Families, hereafter "DCF", filed a petition for the termination of the parental rights of Sheila R. to her son, Dorrell R. This petition also seeks to terminate the parental rights of Dorrell's putative father, Willie D. The trial was held on April 14, 2000. Sheila R. attended the trial. Willie D. has not appeared in this matter and notice to him was by publication. No counsel was appointed to represent him, he did not attend the trial and he had previously been defaulted because of his failure to appear.
For the reasons set forth below, the court grants the termination petition as to Sheila R. on the grounds that she has failed to rehabilitate. The court denies the petition on the remaining two grounds as to her. The court grants the petition as to the absent putative father on the grounds of abandonment, failure to rehabilitate and because there is no ongoing parent-child relationship. Connecticut General Statutes § 17a-112 (c)(3)(A), (B), and (D).
From the evidence presented, the court finds the following facts:
 A. FACTS 1. Events prior to the neglect adjudication.
Prior to Dorrell's removal from his mother's care in February, 1995, there were a number of DCF referrals concerning his care. In January and February of 1993, there were reports filed by the New Haven Lead Clinic that Dorrell's mother had medically neglected him. CT Page 5263 Dorrell had very high lead levels in his system and was hospitalized at that time. A second such report was filed on May 27, 1994. Dorrell was then in the hospital with an extremely high lead level, according to the report, and his mother was not visiting him regularly. On January 6, 1995 a report of educational neglect was filed by the New Haven public school because Dorrell was scheduled to attend a special education pre-school that year and only attended once. On February 17, 1995, the Yale New Haven Hospital, where Dorrell was again hospitalized due to having high lead levels, made another report. This was Dorrell's tenth hospitalization. As a result of this referral, DCF removed Dorrell from the hospital and sought and secured an order of temporary custody on February 17, 1995. DCF also filed a neglect petition and Dorrell was adjudicated neglected on March 17, 1995. His commitment to DCF has been extended several times since that date. Dorrell has remained in foster care since February, 1995, more than five years.
At the time of Dorrell's removal, Dorrell's three younger half-brothers remained in the home. Sheila R., his mother, admitted she was then using cocaine. The DCF social worker made referrals for Sheila in early 1995 for substance abuse treatment and housing, as the apartment had high levels of lead in it. Sheila did not complete the substance abuse treatment at that time, or any other time during the pending neglect and termination petitions.
2. Sheila R., the mother.
Sheila is now thirty-three years old. She is herself the second of five children and by all accounts she had a difficult childhood. She reported to the court-appointed psychologist that her mother was an alcoholic and physically abusive. She was sexually molested between the ages of eight and eleven by one of her mother's boyfriends and then went to live with an aunt. Her sexual victimization continued and she survived a rape at age seventeen. At this age, she gave birth to her oldest child, her daughter Quineshia. Despite the family's problems, Sheila states that hers is a close family. She graduated from high school and has been able to obtain and retain various jobs. Sheila was twenty-one when Dorrell was born, the result of her short relationship with Willie D., the putative father of Dorrell. Subsequently, she has had four other children, the youngest of whom was born in January 1995, just shortly before Dorrell's removal from the home.
After Dorrell's removal, Sheila's other three younger children remained in the home until 1997, when they were also removed. At the time of Dorrell's removal, expectations were set for Sheila, with CT Page 5264 which she did not comply. Specifically, she did not follow through with substance abuse treatment and was unavailable for the in-home family preservation services for the other children, as a result of which the program was cancelled. She also did not visit with Dorrell consistently. The social worker testified that until the other children were removed, the visits with Dorrell were initially at DCF on a weekly basis. Sheila did not regularly attend. Thereafter, the worker changed the visit location to Sheila's home and her attendance improved. Nonetheless, Sheila only managed to attend half of the visits during this time.
In 1997, the remaining children were removed as well as her older daughter, Quinesha and Quinesha's infant. None have been returned to her care and there are presently termination petitions pending against Dorrell's two younger half-brothers. In 1997, DCF received a referral about neglect of the remaining children. At that time, upon investigation, Sheila had no gas or food in the apartment. The court concludes from the events leading to the removal of Sheila's remaining children that Sheila's drug use was actively continuing during this time, as Sheila herself has admitted.
When the other children were removed, the social worker testified, Sheila had not met the expectations set for her in 1995. She did not keep all appointments with DCF. She kept her own whereabouts known to DCF and signed releases. However, she had not stopped using illegal substances, she did not have adequate housing or income and she did not participate in drug or alcohol counseling, individual or group therapy to which she had been referred. Sheila's failure to comply with the expectations set for her continued until after the filing of the termination petition. The social worker testified that Sheila requested a substance abuse referral from her in November 1999.[2]
She stated that the referral was made, but, as had happened so many times in the past, Sheila did not attend. The court concludes, based on the request for the referral, that Sheila was still using illegal substances as late as November, 1999.
Sheila was evaluated by the court-appointed psychologist on June 18, 1999. Dr. Ramos-Grenier testified at trial. She concluded, based on her evaluation of Sheila, Dorrell and the parent child interaction, that Dorrell should not be returned to his mother at the present time. Her recommendation was that Dorrell be permitted permanency and be permitted to be adopted, despite the fact that he is now twelve years old and has some significant handicaps. Specifically, she found that Sheila's cognitive and other limitations, including her anti-social behavior, were such that she could not be expected to provide the specialized care this child CT Page 5265 requires. She stated that to parent a child like Dorrell requires:
 "understanding some more abstract and complex ideas about caretaking, especially for a child that has some of the significant needs that he has. A caretaker would need to be consistent in terms of follow through, to understand different techniques of managing his behavior, . . . what kinds of sanctions and rewards should be given."
She believed that Sheila's cognitive limitations would prevent her from being able to do this. She also testified that Dorrell has autistic traits, although he is able to speak. His mother would need to know "what is autism and what does this mean in terms of his day-to-day functioning." She also believed that Sheila's anti-social behavior and suspicions of those in authority would mean that she could perhaps not understand the need to advocate for him within the system and seek out the services that he required.
3. Dorrell R.
Dorrell is now twelve years old and has been in foster care for a long time. The record reflects that Dorrell was first tested for the presence of lead in his blood stream when he was four years old. The court previously noted that he had twelve hospitalizations before his removal from his mother. At the time of his removal, the social worker testified that he was a very sick little boy. At that time he had high fevers and lost consciousness regularly, at which point Sheila would bring him to the emergency room. However, Sheila did not regularly follow up on the care that the clinic advised he required. The social worker testified Dorrell at that time could not speak more than a few words and was hyperactive. He would drift off and one had to keep a close watch on him. Since his placement in foster care, she noted, Dorrell has learned to speak and is an engaging and likeable boy.
Dr. Ramos-Grenier testified as to the effect of high levels of lead on small children. She stated that lead does not ever really leave the body. She testified that lead poisoning has a life-long impact. "The lead adheres to the brain tissues. The brain then reorganizes itself around the damaged areas and this can lead to a lowering of cognitive functions cross the board." She also noted that the autistic traits she found in Dorrell may be associated with the lead poisoning. She concluded that his test results revealed adequate non-verbal problem solving skills, but that his verbal abilities were low. She stated, "you see this in children who have a history of lead poisoning." She noted that Dorrell was a cooperative and friendly child with her and that he did not display any signs of temper or CT Page 5266 violence. Because of his special needs, she testified that he would function best in a family where his handicaps are understood. "He does need to be in an environment where he feels accepted and understood."
As to the nature of the parent-child bond, Dr. Ramos-Grenier did not see a close bonded relationship between Dorrell and his mother. She noted that they did not have much information to share with each other. Dorrell did not seek or look for any physical affection from his mother. There was nothing present in the session to indicate any emotional attachment. The social worker also noted a detachment between the two. She observed that during visitation sessions between Dorrell, his other siblings and his mother, Sheila did not seek to interact with him and merely watched passively. While Dorrell interacts well with his siblings and enjoys his visits with them, he never mentions his mother and appears indifferent to her. In response to one of the specific referral questions posed to her and questions at trial, Dr. Ramos-Grenier did indicate that counseling with Dorrell and his mother had the potential to improve their relationship. Nonetheless, the balance of her testimony made it clear that this possibility would not cause her to change her overall recommendation that Dorrell should be provided with a permanent home which was not with his mother.
Dorrell's experiences in foster care have been unfortunate and have added to the already difficult start in life that he has had. Indeed, his foster care placements and a determination of what is in his best interests form the crux of this case and the competing claims advanced by the parties. After a month into his initial placement, in March, 1995, Dorrell was placed with his maternal uncle. He remained there until October, 1995 until his uncle decided he could not keep him any longer as he wanted to return to school. He then was placed with a foster parent, Craig H., who was able to devote a great deal of time and attention to him. It was during this time that Dorrell learned to focus better, to read and to speak more clearly. He and his foster father had a loving and connected relationship and Dorrell became very close to him. Unfortunately, after three years, in September, 1998, Dorrell's foster father moved to Florida. DCF expected that Dorrell would follow his foster father to Florida within three months. However, the foster father postponed Dorrell's move to Florida for so long that finally DCF concluded it would not happen. Because Craig H. continued to call Dorrell and hold out vague promises, DCF was also forced to terminate contact between them. As is to be expected, Dorrell had a hard time with the change in his life plans.
When Dorrell's foster father moved to Florida, Dorrell was placed CT Page 5267 with a foster mother with several other biological and foster children. It was the intention of all that this would be a temporary placement. Since Dorrell cannot follow his foster father to Florida, it has now become a more long-term placement. However, his foster mother is not able to adopt Dorrell and a new permanent home for him has as yet not been located. On the one hand, it is claimed, if no permanent home for Dorrell is found, it may not be of any benefit to him to terminate his parental rights to his mother. On the other hand lies the hope that once he is free for adoption, a wider and more concerted search for an adoptive home can be made, which will be successful. Both the social worker and Dr. Ramos-Grenier believe that Dorrell is an adoptable child, despite his age, and that his special needs do not preclude an adoption.
4. Willie B., the putative father.
There is no information available about Willie D. He has never participated in Dorrell's life. During the pendency of the neglect petitions, he denied paternity, but never made himself available to DCF to have any testing completed. His present whereabouts are unknown and notice of the petition was provided to him.
 B. ADJUDICATORY FINDINGS 1. Reasonable Reunification Efforts.
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts . . . provided that this finding is not required if the court has determined at a hearing . . . that such efforts are not appropriate." Connecticut General Statutes § 17a-112 (c)(1). DCF does allege that Sheila is unable or unwilling to benefit from such services. Further, the court also made a finding that further efforts were not required on February 17, 1998, three years after Dorrell was removed from his mother. Respondent mother argues that because she was in agreement with the plan for Dorrell's adoption by Craig H., she made no real attempts to reunify with him in 1998 and 1999. Further, she claims, it is fundamentally unfair to terminate her rights because she relied upon a plan, which was in Dorrell's best interest, but did not come to pass, through no fault of her own.
The court would have some slight sympathy with this argument, had DCF cut off Sheila's access to Dorrell after February, 1998 and not CT Page 5268 provided either visitation or services. The claim would have even more merit had Sheila made demonstrable progress in the early years of Dorrell's placement. But neither of these things happened. Sheila had not made any progress toward reunification when Dorrell had been in care for over two years. Further, DCF has permitted visitation up to the present time. DCF has also continued to provide services after the termination petition was filed, despite the court order.
Connecticut General Statutes § 17a-112 (a)(1) does not contain within it a definition of the term "reasonable." The Connecticut Court has held that "reasonable" is a term which varies according to its context and is synonymous with equitable, fair, and just, citing Webster's New International Dictionary (2nd Ed.). State v. Antrim,185 Conn. 118, 122 (1981) (citations omitted). More recently, in the termination of parental rights context, the Appellate Court stated that reasonable efforts means doing everything reasonable, not everything possible." In re Savanna M., 55 Conn. App. 807, 812-813, ___ A.2d ___ (1999) (citations omitted); In re Jessica B.,50 Conn. App. 554, 566, 718 A.2d 997 (1998). DCF took such reasonable steps in this case. The court finds, by the clear and convincing evidence, DCF made reasonable reunification efforts. The court further concludes that those reasonable efforts continued past the filing of the termination petition. In this case, DCF has also alleged that the parents were unwilling and unable to benefit from reunification efforts. The court concludes from the clear and convincing evidence that neither Sheila R. nor Willie B. were able to benefit from reunification services. Willie B. never came forward to acknowledge his son. For Sheila many services were provided, but she did not complete any such programs and did not deal with the issues of her substance abuse
2. Sheila's Failure to Rehabilitate.
On February 1, 1995, Dorrell was adjudicated neglected and committed to the care and custody of DCF for a period of twelve months. His commitment has been extended since that time. The court further finds, by clear and convincing evidence, that as of the date of the filing of the termination petition on February 1, 1999, Sheila had not achieved such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, she could assume a responsible position in his life. Connecticut General Statutes § 17a-112 (c)(3)(B). "Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent." In re Migdalia M., 6 Conn. App. 194, 203,504 A.2d 532 (1986), see also In re Juvenile Appeal,
CT Page 52691 Conn. App. 463, 477, 473 A.2d 795 (1984). The court concludes Sheila's lack of rehabilitation continued even after the filing of the termination petition and that there is no prospect that she will be rehabilitated within the foreseeable future.
The statutory framework requires the court to analyze the parent's rehabilitation "as it relates to the needs of the particular child" and consider if such rehabilitation is foreseeable "within a reasonable time." In re Luis C., 210 Conn. 157, 1167, 554 A.2d 722
(1989), In re Hector L., 53 Conn. App. 359, 366-367, ___ A.2d ___ (1999). Because of this requirement that the court predict what may happen within a "reasonable time" after the filing of the termination petition, the court must consider not only Sheila's conduct prior to the filing of those petitions, but also her conduct after that time. In this case, this was a period of slightly more than one year. As of November, 1999, the court has concluded that Sheila was still actively engaged in substance abuse. It may be that she has been able to maintain her sobriety since that time. However, the court concludes that the time still required for her to fully rehabilitate and to be able to care for any child reliably is lengthy. Further, her own cognitive impairments make her ability to care for Dorrell, a child with special needs, unlikely. The court therefore finds, from the clear and convincing evidence, that she cannot be rehabilitated as a parent of this child within the reasonably foreseeable future, consistent with his needs for permanency.
3. Willie D.
The court also finds that as of February 1, 1999, Willie D. had abandoned Dorrell. "Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare." In re Juvenile Appeal (Docket No. 9489),183 Conn. 11, 14, 438 A.2d 801 (1981). Willie D. was never involved in the life of this child. His whereabouts are presently unknown.
The termination petition also alleges that there is no ongoing parent-child relationship between Willie D. and Dorrell and to allow further time for the development of such a relationship would be detrimental to the best interests of the child. Connecticut General Statutes § 17a-112 (c)(3)(D). The court so concludes from the clear and convincing evidence.
 C. REQUIRED FINDINGS
The court makes the following factual findings required by CT Page 5270 Connecticut General Statutes § 17a-112 (e):
(1) Appropriate and timely services were provided by DCF to the family. These include services to benefit the child, referrals for Sheila to deal with issues of parenting, housing and substance abuse. DCF also provided visitation and case management services.
2) As previously noted, the court finds by clear and convincing evidence that DCF made reasonable efforts to reunify the family.
3) The terms of any applicable orders entered into and agreed to by any individual or agency and the extent of fulfillment of those obligations. The court finds that reasonable court expectations were set for Sheila and she was not able to even minimally fulfill them. None were set for Willie D. as he did not make himself available to DCF.
4) The feelings and emotional ties of the child with respect to the parent, any guardian of the person and any person who has exercised physical care, custody and control of the child for at least one year and with whom the child has developed significant emotional ties. Dorrell has begun to settle into his foster home and calls his foster mother "mommy". He is not attached to his biological mother. He does not know his putative biological father, Willie D., who has never been a presence in his life.
5) Finding regarding the ages of the child: Dorrell was born on October 22, 1987 and is twelve years old.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the child to return him to their home in the foreseeable future and (A) the extent to which the parents have maintained contact with the child as part of an effort to reunite the child with them, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the child. As detailed above, the court finds that none of the parents has made any changes in their lives to accommodate the care and nurturing of this child. Sheila has visited Dorrell in a sporadic fashion. Only after the filing of the petition did she send him gifts and cards and recognize his birthdays. She has not dealt with her substance abuse to be able to parent this child. Willie D. has never had any contact with him.
7) Finding regarding the extent to which a parent has been prevented from maintaining a reasonable relationship with the child CT Page 5271 by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent. No such conduct is noted. DCF has taken many steps for many years to encourage Sheila to have a meaningful relationship with Dorrell and to rehabilitate herself, which she has been unable to accomplish. Further, no such conduct is noted as to the biological father.
 D. DISPOSITION
The court concludes, from the clear and convincing evidence, that there is no biological parent ready now or in the foreseeable future, who will be able to care for Dorrell. Despite the fact that continued counseling between Sheila and Dorrell could possibly improve their relationship, the court concludes it is both too little and too late as Sheila simply does not possess the capacity to care for this special needs child. The court concludes, from the clear and convincing testimony, that it is in Dorrell's best interests to have permanency and stability in his life. The court further finds that adoption by a family that understands and can accommodate his special needs is the avenue most likely to accomplish this result for Dorrell. The court also finds the testimony concerning Dorrell's adoptability persuasive. The court is aware that there are a number of private adoption agencies for placement for children like Dorrell. The court concludes that termination of his parents' rights to him will make his ultimate adoption more probable.
The Connecticut legal system for child protection does not permit the Juvenile court to manage and supervise the adoption process. Such tasks are assigned to the Probate courts of our state and historically they have managed this task very well. The future will determine whether or not this child finds a permanent home. This court holds that such a home is in his best interests and therefore terminates his parents' rights to Dorrell to provide him this opportunity. The court therefore orders that a termination of parental rights enter with respect to Sheila R. and Willie D. The court further orders that a permanency plan for Dorrell be submitted within sixty days. A review plan for him shall be filed in accordance with state and federal law.
___________________ Barbara M. Quinn, Presiding Judge Child Protection Session