Memorandum of Decision
On June 22, 1998, the Department of Children and Families (DCF) filed a petition to terminate the parental rights of Joseph and Margaret D. to their minor son, Vincent D. On September 28, 29, and 30, 1999, trial of the termination petition took place in this court. For the reasons stated below, the court grants the termination petition.
FACTS
The court finds the following facts and credits the following evidence.
A. The Parents
Margaret D. was born in Poland in 1966. She came to this country when she was about six years old. She left high school in the eleventh grade because she became pregnant and because her mother was ill. On January 1, 1984, Margaret gave birth to Michael H. Michael's father is Luiz O., who never married Margaret, who has not been a part of his son's life, and whose whereabouts are unknown.[2]
Margaret then went to work in a factory and lived with her mother. In the mid-1980's, she changed jobs and met Joseph D. She married him in January, 1989. They had a baby girl, Jessica D., in 1991.
Joseph worked as a truck driver and had a long history of using marijuana and cocaine use. Margaret herself had begun using alcohol at age nine and marijuana at age eighteen. Joseph introduced Margaret to crack cocaine in approximately 1994. Margaret became addicted and began using drugs several times a week, although at relatively low levels.
Margaret delivered Vincent prematurely in the bathtub of her home on September 1, 1996. At the hospital, Vincent tested positive for cocaine. Because of the parents' drug use, DCF obtained an order of temporary custody for all three children and placed them in foster homes. CT Page 13681
On October 8, 1996, the court adjudicated Vincent neglected and ordered him committed to DCF for a period of one year.[3]
Shortly thereafter, the court imposed expectations for the parents to meet in order to improve their chances of regaining custody of their children. In furtherance of these expectations, DCF referred the father to two substance abuse programs. He was discharged from both. The father tested positive for marijuana and cocaine in August and September, 1997. The father completed a third drug program at an inpatient clinic in December, 1997, but never complied with recommended aftercare. The father tested negative for drugs on one occasion prior to the end of July, 1998, but missed three other drug test appointments. In 1999, the father missed all four scheduled hair tests for drugs, although he did attend relapse prevention sessions, parenting classes, and couples counseling.
The mother has been drug-free since November, 1996. She completed an outpatient substance abuse program in 1997 and no further treatment was recommended. The mother nonetheless returned, as a result of a DCF referral, for further substance abuse counseling in October, 1998. She also participated in Narcotics and Alcoholics Anonymous meetings, individual therapy, couples counseling, and parenting classes. The mother successfully completed treatment in May, 1999.
The mother and father lived together until September, 1997, when they lost their home due to failure to pay their rent or mortgage. The mother moved in with her own mother, the maternal grandmother, in an elderly housing complex where the mother, and certainly children, were not allowed. The mother held a variety of jobs but did not have a stable income. The father moved in with his sister, and after that lived in various other locations. The father apparently remained employed in the moving business, although he did not provide DCF with documentation of his employment. The DCF case worker referred the parents to employment training and job skills workshops and assisted the mother with housing references and affordable housing. In October or November, 1997, DCF referred the mother to a family reunification program, but the program did not accept the mother because it could not verify her sobriety and the mother did not have adequate housing.
Throughout this period, the case worker had advised the mother that, to get her children back, she should not live with the father as long as he is not drug free. The mother understood CT Page 13682 this advice and vowed that, if she had to choose between her husband and her children, she would choose her children. At a meeting in May, 1998, DCF explained to the mother that Vincent, who had by then been in foster care for over a year and a half, needed to have a permanent home.
In June, 1998, the mother nonetheless moved back into an apartment with the father. Over the next year, the mother often expressed the intention to separate from the father but never did so. In August, 1999, the mother moved out and took steps toward filing for divorce. The mother found this move very difficult to make because Joseph had been part of her life for about fifteen years and it was her desire to unite the family. As the mother also testified, she had to put "first things first," and maintain her sobriety before she could fully confront her marital problems. A psychological evaluation conducted in December, 1998 revealed the mother to be overly dependent on her relationship with Joseph.
The mother has maintained a twenty-five hour per week job for the last six months. She has moved into the house of a friend who has supported her in her recovery from substance abuse. The house is adequate for a family and is in a nice neighborhood. On September 13, 1999, however, a judgment of strict foreclosure entered against the owner of the property. The mother's current plans are uncertain.
DCF has offered the parents weekly visitation with the three children at DCF offices since the children went into foster care. The father missed numerous visits through April, 1999. Indeed, at one point, the father questioned his paternity of Vincent. At some of the visits that he did attend, the father would act immaturely or aggressively. Since April, 1999, the father stopped visiting altogether and has not maintained contact with DCF. Two days before the commencement of trial, he happened to meet the prior DCF case worker and told him that he would not be coming to court because the court is just going to do what it wants to do. As promised, the father did not appear at trial.
The mother has attended visits with her children regularly. Vincent has been absent from a good percentage of the visits due to DCF transportation problems. For some period of time, the main activity of the visits was a family meal. Because DCF was concerned that the visits focused more on the meal than other types of interaction, DCF, in April, 1999, brought in a parent CT Page 13683 aide who would assist with the visits and provide additional parenting instruction to the mother. The mother's parenting skills have improved and Vincent, at times, has been more responsive to her.
B. Vincent and His Siblings
Vincent has been in the foster home of James and Michelle H. since his discharge from the hospital at birth. Born prematurely and testing positive for cocaine, Vincent was ill frequently during his first year of life and delayed in development. He had a hernia operation at two months of age.
After his difficult start, Vincent has grown and become healthy. The foster parents have given Vincent a loving, nurturing environment. Their home includes their two biological children — Jessica, who is thirteen, and Michelle, who is eight — with whom Vincent is very attached. Vincent also sees his foster grandmother daily and foster grandfather weekly.
In early 1997, DCF placed Jessica D. in the H. foster home, which represented Jessica D.'s fourth placement.[4] Jessica D. was initially aggressive towards Vincent but, by early 1999, they had become closer. With DCF permission, Margaret regularly phoned the foster home and spoke to Jessica D. In June, 1999, at the foster parents' request, DCF removed Jessica D. from the foster home and placed her in a specialized foster home to address her significant behavioral problems. Jessica D. remains bonded to her mother. Although DCF filed for termination of parental rights with regard to Jessica D., DCF has withdrawn the petition and now favors reunification of Jessica D. with her mother. Vincent still enjoys seeing or hearing from Jessica D.[5]
After Jessica D. left the foster home, the mother stopped phoning there. She has never asked to speak to Vincent on the phone, even though he is now old enough to do so. The mother has also never sent Vincent any cards or letters to be read to him. After some of the recent visits with his mother, Vincent has returned to the foster home and acted out wildly, although the reason for this behavior is not clear. Vincent does have positive feelings for his biological mother.
Vincent's foster parents did not take Vincent into their home with the goal of adopting him. What started out as a temporary placement, however, gradually became one of three years' CT Page 13684 duration. Vincent has become part of the family. On occasion, Vincent wakes up at night and asks Michelle to hold him. He calls his foster parents "Mommy" and "Daddy." He eagerly waits for his foster sisters to come home from school on the bus.
The foster family now wishes to adopt Vincent because they love him and he loves them. The foster parents agree that the adoption should be open in that Vincent should know of and communicate with his biological family. But they feel that Vincent would be devastated if he were permanently removed from their home.
TERMINATION ADJUDICATION
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." General Statutes (Rev. to 1997) § 17a-112 (c)(1).[6]
"Reasonable efforts means doing everything reasonable, not everything possible." In re Jessica B., 50 Conn. App. 554, 566,718 A.2d 997 (1998).
In this case, the evidence is clear and convincing that DCF did make reasonable efforts to locate the parents and reunite them with Vincent. DCF referred the parents to drug treatment centers, job training, individual and couples counseling, psychological evaluations, and parenting classes. DCF referred the mother to a family reunification program and assisted her with housing references and affordable housing. DCF also offered the parents weekly visitation with their children and the opportunity for the mother to phone Vincent and Jessica at their foster home. The purpose of these services was to improve the parents' economic, physical, and emotional well-being, and to develop a relationship with their child, so that they would be in a position to regain custody of him.
B. Statutory Grounds
To prevail in a nonconsensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See InCT Page 13685re Michael R., 49 Conn. App. 510, 512, 714 A.2d 1279, cert. denied, 247 Conn. 919, 722 A.2d 807 (1998); General Statutes (Rev, to 1997) § 17a-112 (c)(3). General Statutes § 17a-112
(c)(3) (Rev. to 1997) requires that, with one exception not pertinent here, these grounds must have existed for at least one year unless the court waives the one year requirement based on the standards set forth in § 17a-112 (d). In this adjudicatory phase, the court is ordinarily limited to events preceding the filing of the petition or the latest amendment. See Practice Book § 33-3(a).
There being no material amendments to the petition, the adjudicatory date in this case is June 22, 1998. DCF has alleged the ground of failure to rehabilitate against both parents. The court finds that DCF has proven its allegations by clear and convincing evidence.
The ground of failure to rehabilitate arises when "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes (Rev. to 1997) § 17a-112 (c)(3)(B). No dispute exists that the court adjudicated Vincent neglected on October 28, 1996, thus satisfying one element of the statute.
The rest of the statute requires the court to find whether the parent has achieved "such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes § 17a-112 (c)(3)(B). The statute requires the court to analyze the parents' rehabilitative status "as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable `within a reasonable time.'"In re Luis C., 210 Conn. 157, 167, 554 A.2d 722 (1989). The statute, however, does not require parents to "be able to assume full responsibility for [a] child, unaided by available support systems." In re Juvenile Appeal (84-3), 1 Conn. App. 463, 477,473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984). Because of the requirement that the court predict what will happen within a reasonable time" after the filing of the termination petition, it is sensible to conclude that the court CT Page 13686 can consider not only the parents' conduct before the filing of the termination petition, but also the conduct occurring after it.
The father's case is straightforward. The main concern is that he did not overcome his drug problem. Although the most recent drug test that he attended resulted in a negative finding, he did not keep most of his drug test appointments. During the adjudicatory period, he did not comply with recommended aftercare. His overall record gives rise to the belief that there is a significant risk of relapse. Further, for a period of nine months, the father did not have adequate housing. He also did not document his employment. The father missed numerous visits with Vincent and, at the visits he attended, he acted immaturely or aggressively. Overall, for a period of over one year, the father did not rehabilitate himself to the point at which he could become a responsible person in Vincent's life.
The mother's case is closer, but the court finds that DCF has met its burden of proof. It is true, of course, that the mother's recovery from her cocaine habit was unwavering. She confirmed that a committed individual can overcome the scourge of drugs. For that she deserves commendation.
But the mother's recovery came at a high price. By putting "first things first," as she put it, she elevated drug treatment over other needs that she had to address in order to regain custody of Vincent. The mother did not demonstrate good parenting skills at the visits until well after the adjudicatory period. More importantly, she did not maintain adequate income and housing in accordance with court-ordered expectations, despite DCF assistance in both areas. Her employment was not steady. From the October, 1996 neglect adjudication to September, 1997, she lived with Joseph D. while he was still using drugs. She then separated and moved into an elderly housing complex that did not allow children. In June, 1998, she moved back with her husband even though his recovery was not complete.
DCF advised the mother on numerous occasions that she might have to choose between her husband and her children, and the mother understood this advice. The mother, by separating from Joseph and then moving back, was at best indecisive and at worst, from the standpoint of regaining her children, badly mistaken. While the mother was faced with a painful choice, especially given her difficulties in supporting herself and her dependency CT Page 13687 on Joseph, her position today in opposing termination reveals that she did not fully consider her children's needs at the time. Nor did the mother come up with a viable plan for regaining Vincent's custody in the future. She did not fully appreciate that, while she was attempting to salvage her marriage, Vincent was developing a bond to his foster family. As time went on, reunification with the mother would become more difficult for Vincent, if not detrimental to him. In short, although the mother demonstrated personal rehabilitation in many respects, she did not rehabilitate as a parent, see In re Christina V.,38 Conn. App. 214, 219-21, 660 A.2d 863 (1995), and she did not rehabilitate "as it relates to the needs of the particular child." In re Luis C., supra, 210 Conn. 167. Thus DCF has proven by clear and convincing evidence that, for a period of more than one year, the mother failed to rehabilitate herself within the meaning of the termination statute.[7]
DISPOSITION
In the dispositional phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." General Statutes § 17a-112 (c)(2). The court can consider all events occurring through the close of the dispositional hearing. Practice Book § 33-5.
The best interest of Vincent D. clearly and convincingly requires termination of the parental rights of his natural parents. The father was essentially no more than an occasional visitor to Vincent for a period of time. After April, 1999, he was not even that. He has lost contact with DCF and apparently has lost interest in this case.
The mother has continued to progress personally. She has held a job for six months. She has found the courage to leave her husband again and, presumably, forever. On the other hand, she still has no viable plan for Vincent's return. Her current housing arrangement will apparently not work because of the foreclosure judgment against the owners of the property.
Even if the mother had a plan, or quickly developed another one, it would be too late. While the three years that it took the mother to rehabilitate herself is reasonable in many respects, it is an eternity in the life of a child. Indeed, it is Vincent's entire life to date. For those three years, Vincent has not known CT Page 13688 Margaret as his mother. He has never lived with her. It is surely not in Vincent's best interest to restart his life at this point on the ground that his biological mother may now be ready to assume her parental role.
Vincent was lucky to have been taken out of drug culture of his natural parents and placed in foster care. He was even luckier to have been placed with the H. foster family. They have nurtured him back from his rather precarious beginnings and made him into a healthy, happy little boy. They have made Vincent a part of their family and Vincent clearly feels attached. To tear him away from the H. family for the purpose of placing him in Margaret's custody would be akin to terminating the wrong parental rights. The court agrees that such a decision would be devastating to Vincent.
The foster parents, moreover, have taken an enlightened approach to the adoption issue. They have pledged to have Vincent maintain contact with his biological family, which presumably means not only his mother (and father, if he becomes available), but also his brother and sister. This sort of contact is clearly in Vincent's best interest because he will eventually want to know his biological family. Margaret, moreover, by virtue of her personality and her personal recovery, would be a perfectly appropriate person for Vincent to know. This court is "not prepared to assume that the welfare of children is best served by a narrow definition of those whom [it] permit[s] to continue to manifest their deep concern for [their] child[ren]'s growth and development." Michaud v. Wawruck, 209 Conn. 407, 415,551 A.2d 738 (1988).
In arriving at a decision, the court must consider and make written findings regarding seven factors set out in General Statutes § 17a-112 (e). See In re Tabitha P., 39 Conn. App. 353,362, 664 A.2d 1168 (1995). A discussion of these factors follows.
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
Based on the foregoing discussion, the court finds that DCF provided foster care for Vincent, visitation to the parents, and the opportunity for the mother to speak to Vincent on the phone. DCF referred the parents to drug treatment centers, job training, individual and couples counseling, psychological evaluations, and CT Page 13689 parenting classes. DCF referred the mother to a family reunification program and assisted her with housing references and affordable housing. These services were relevant to the parent's needs and were offered in a timely manner.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
Based on the foregoing discussion, the court finds that DCF offered the parents appropriate services and guidance, and sufficient time to permit family reunification.
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
On October 28, 1996, the court entered the following expectations for the parents to meet: (1) keep all appointments set by or with DCF, (2) keep whereabouts known to DCF and your attorney, (3) visit the child as often as DCF permits, (4) participate in counseling (individual and drug/alcohol) 5) sign releases, 6) secure and maintain adequate housing and income, 7) no substance abuse, 8) no involvement with the criminal justice system, and 9) attend NA, AA, and CA meetings. On March 1, 1999, the court entered specific steps that were similar but also included orders for the parents to obtain parenting and couples counseling, successfully complete substance abuse treatment, and submit to random drug testing.
As detailed above, DCF substantially met its obligation to provide assistance. The father's compliance with these expectations was inadequate, especially in the areas of substance abuse use and treatment, visitation, and maintaining adequate housing. The mother complied with the expectations except for the critical one of maintaining adequate housing and income.
4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
As stated above, Vincent is closely bonded to the foster CT Page 13690 family. The court appointed evaluator found, in December, 1998, that Vincent probably had psychological ties to his natural parents, as well. With the father's effective withdrawal from Vincent's life, any emotional ties Vincent had to him would presumably have weakened if not disappeared. Vincent does have some positive feelings for his mother.
5) The age of the child.
Vincent is three years old.
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the court finds that the parents did not adjust their circumstances in time to make it in the Vincent's best interest to return to their home. The mother did maintain regular visitation although the quality of the visits was not the highest. The mother did not send any correspondence to Vincent or attempt to speak with him on the phone. The father was essentially only an occasional visitor to Vincent.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
As discussed above, the parents' difficulties stem primarily from their own lifestyle choices and not from unreasonable interference of other persons or economic circumstances beyond their control. The father was an obstacle to the mother's maintaining a relationship with Vincent, but only because the mother chose to reunify with him rather than concentrate on reunifying with Vincent.
CONCLUSION
CT Page 13691
Based upon the foregoing findings, the court determines that it is in the best interest of Vincent D. for a termination of parental rights to enter with respect to the father, Joseph D., and the mother, Margaret D. Accordingly, the court grants the petition to terminate parental rights. The court further orders that the Commissioner of DCF is appointed statutory parent for Vincent for the purpose of securing an adoptive family. If the current foster parents are willing to adopt, it is the court's direction that they receive first consideration. The court also extends Vincent's commitment to DCF to October 27, 2000 unless the court's judgment of termination becomes final before then. The Commissioner shall file with this court no later than 90 days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
It is so ordered.
Carl J. Schuman Judge, Superior Court