MEMORANDUM OF DECISION
On March 23, 1999, the Department of Children and Families (DCF) filed a petition to terminate the parental rights of J. H., mother, and R. B., father, to their daughter, Rocha B. On October 19, 1999, trial concerning the petition occurred in this court. For the reasons stated below, the court grants the termination petition.
FACTS
The court finds the following facts and credits the following evidence, except as noted.
A. Background of the Case
Rocha B. was born on October 14, 1996 and tested positive for cocaine at birth. Four days later, due to various factors, including the mother's significant history of substance abuse and the father's incarceration, DCF filed a neglect petition and the Superior Court for Juvenile Matters at Uncasville granted an order of temporary custody (OTC) after finding her in immediate physical danger from her surroundings. Rocha was placed in DCF's custody in order to safeguard her welfare. On February 13, 1997, the Superior Court adjudicated her as neglected and committed her CT Page 14638 custody to DCF. On February 19, 1998, the commitment was extended and the court found that reasonable efforts had been made to reunify the family and that further reunification efforts were appropriate. On February 9, 1999, the court granted a further extension of the commitment until February, 2000, finding that reunification efforts were appropriate concerning the father, and not appropriate concerning the mother.
On July 26, 1999, the court entered Expectations concerning the father. On August 17, 1999, the mother voluntarily consented to the termination of her parental rights to Rocha. Rocha has remained in foster care under DCF's custody since the OTC was granted.
B. The Father
R. B. was born in 1966 and grew up in the New London area. He has an extensive criminal history which began in 1982. He was incarcerated, for assault and robbery, since before Rocha was born in 1996. (Exh. 2). She has never been in his care. While he was incarcerated at the time of trial, it was expected he would be released in November, 1999, and then be on probation for a three year period. Since he received a ten year sentence, suspended after serving three years, a substantial amount of suspended prison time remains.
R. B. completed the tenth grade in New London, but was expelled for fighting. He has been in an out of prison since then and stated to the court-appointed psychological evaluator that he supported himself by stealing. His record reflects a history of assaults, larceny, possession of narcotics, failure to appear, and other convictions. As he himself stated at trial, his record is "terrible." His record while incarcerated is also poor, having included many disciplinary reports. Of particular concern is an incident for which he was disciplined in 1997, as a result of which he was placed in segregation, for having written a graphic letter to a correctional counselor threatening her with serious physical injury, including cutting her throat.
1. Compliance With Expectations
DCF recommended to R. B. that he accept programs offered through the Department of Corrections to address domestic violence, anger management, substance abuse, and parenting. All of these reflected legitimate concerns given his history. These CT Page 14639 expectations were contained in four separate Treatment Plans, dated October 1, 1997, April 1, 1998, October 26, 1998, and April 21, 1999, which were mailed to him. At trial, R. B. claimed that he only received the Expectations ordered by the court after the filing of the petitions in 1999. However, he acknowledged receipt of earlier correspondence concerning DCF's expectations. The court finds he was apprised by DCF of what he was expected to accomplish.
With regard to his completion of programs, he advised DCF that it was none of DCF's business what programs with which he was involved. Rather than work with DCF towards these goals, R. B. refused to sign a release authorizing DCF to communicate with the Department of Corrections. He has not participated in any of the recommended programs and did not provide any documentation to DCF as to how, if at all, he may have been prevented from access to programs while incarcerated.
Correspondence between DCF and R. B. provides evidence of his unwillingness to respond to reasonable expectations. By letter dated January 22, 1998, more than a year before the filing of the petition, Carolyn Walukiewicz, a DCF social worker, advised him of specific expectations which were needed to be fulfilled in order to be considered as a placement resource for Rocha, including substance abuse treatment, parenting classes, and an anger management program. Exh. 7. His response, dated January 26, 1998, Exh. 8, is illustrative of his attitude. On the one hand he wrote, "its not everybody business when it comes to me and my little girl" and on the other hand that when the matter got to court he would let her know "what time it is." In short, to him, it was not "any of your business." Id. At trial, he acknowledged that in communicating to DCF he sometimes overdid it.
Michelle Jones, a correctional counselor employed by the Department of Corrections reviewed R. B.'s history while incarcerated and testified at trial. R. B. received an addiction rating of 4 out of 5 when he was initially evaluated for his recent period of incarceration. This is a high rating; she has only seen one or two people rated as "5". She noted that the facility where R. B. was then located held regular alcoholics anonymous/narcotics anonymous meetings, for which there were no waiting lists. R. B. had not attended any meetings. Exh. 4, a letter prepared by Ms. Jones, dated October 6, 1999, summarized her review. CT Page 14640
Also, since 1996, he had not completed a "tier two" program. If he had done so, he could be housed in a less secure setting. An inmate cannot be "tier two" program-eligible if he has had disciplinary problems.
She noted that R. B. had been disciplined for eight incidents which occurred during his incarceration since 1996, including, as examples, assault and threatening. On two separate occasions he was disciplined for threatening Department of Corrections staff, including a correctional counselor.
2. Visitation
DCF provided R. B. with the monthly opportunity to visit Rocha while he was incarcerated. The first visit occurred in February, 1997. Since then 30 visits were scheduled and 24 were held prior to trial. R. B. was transferred to a correctional facility at Cheshire and then to a facility in Somers. During the winter of 1997 — 1998, Rocha was diagnosed with asthma and suffered from a bronchial problem. The trip from Groton where she lived in foster care to Cheshire for the visit and back again took six hours. Ms. Walukiewicz, the DCF social worker assigned to the case, mentioned to R. B. that it was a hardship for Rocha, who was having difficulty breathing, to be transported during winter weather for such a lengthy period. R. B. demonstrated his lack of concern for Rocha's well-being by refusing to postpone visitation.
R. B.'s lack of parenting skills and unwillingness to cooperate with DCF were also demonstrated when, at a visit, he chewed a cookie in his own mouth and then put the chewed contents in Rocha's mouth. A nurse characterized this as a bad practice since it could result in the transmission of communicable diseases. He was asked by Ms. Walukiewicz to stop this distasteful and unsanitary practice, but he refused to do so.
Mrs. Walukiewicz spoke to R. B. at least six times since she was assigned the case. He never presented a specific or general plan for Rocha.
3. Psychological Evaluations
Two court-ordered evaluations of R. B. were undertaken, one in April, 1998 and the other in March and April, 1999, by Dr. Bruce Freedman, a psychologist, who testified at trial. In the CT Page 14641 course of the first evaluation. R. B. was administered psychological tests. Dr. Freedman concluded as a result of the 1998 testing that R. B. had average intelligence or better, but had "trouble setting goals and working toward them in a systematic way." Exh. 5 at 3. He also found that R. B. tended to keep his own feelings "guarded from other people." Id. He showed a "low level of sensitivity and responsiveness to the feelings of others." Id. Dr. Freedman noted, concerning R. B.'s son, that when R. B. had been out of prison for a few months, R. B. "did not have the patience or tolerance of authority to sustain visiting or work with DCF on behalf of his son." Id.
In the second evaluation, R. B. was interviewed again by Dr. Freedman. While R. B. complained that some correctional facilities in which he had been placed had no programs and others had programs to which he had not been able to gain admission, he admitted that he had never completed any programs during his period of incarceration. Exh. 6 at 2. He also admitted neglecting his other child while he was out of prison. Id. at 2-3. During this same period, he briefly worked at two restaurants. He left both jobs even though his then-girlfriend was pregnant at the time. Id. at 3.
He complained to the evaluator "that everyone had ideas of what he needed to do to rehabilitate himself, and that he did not need any program, but could straighten himself out." Id. On the other hand, he acknowledged that "he was not there or involved with his children, and that he had no one to blame other than himself." Id.
When tested during this second evaluation, R. B. could not manage the concentration and cooperation required. He did not exhibit the patience required to complete a short personality test. Id. In this evaluation, his intelligence tested lower, close to the cut-off for mild mental retardation. Id. at 4. Once again the personality testing indicated that R. B. would have difficulty in setting goals and working towards them. Dr. Freedman concluded that, "his thinking and judgment was highly distorted by his own lack of consideration for others" and that he lacked the "patience, tolerance, and other qualities required for sustained relationships with other people." Id. Dr. Freedman also reported that he was "quick to become defensive or angry, slow to calm himself or back off a confrontation." Id.
At trial, Dr. Freedman noted that, having seen R. B. twice, CT Page 14642 he concluded that R. B. clearly fit the diagnosis of antisocial personality disorder, a style of personality likely to have been developed at an early age and to continue on for a lifetime.
Given his criminal history, and his poor performance when he was out of prison, where he showed that he had little or no patience, Dr. Freedman believes that R. B. would not have the ability to give of himself to be able to address the needs of a young child. He predicted that, once released, R. B. would have difficulty maintaining regular income and that, if he lived with someone else, there would be escalating difficulty in getting along with that person, meaning that his ability to remain in the home would be quickly in jeopardy.
4. Respondent's Witnesses
In response to the Petition, R. B. presented his mother, S.B., and himself as witnesses. His mother is willing to have R. B. come to live with her after he is released, until he gets on his feet. If he does well on release, she is willing to have Rocha stay with her as well.
R. B. testified that he plans to go to school to learn to be a barber for five or six months after his release. He claims that Rocha calls him "Daddy." He explained that when he put the "chewed cookie" in Rocha's mouth, he was doing what he had been taught. His plan is to be ready to take care of Rocha full-time in seven or eight months.
With regard to the completion of programs, he offered excuses as to why he had not pursued what DCF requested. He offered no excuse for refusing to provide a release to DCF to permit review of his correctional records. He claimed to have gone to alcoholics anonymous/narcotics anonymous ("AA/NA") meetings.
As to Dr. Freedman's evaluations, he claims that Dr. Freedman approached him in a way he was not used to being approached. He claimed that he did not understand that the evaluations related to his children.
He asserted that he previously let his son down but is now willing to do whatever it takes to relate to Rocha. He described her affection for him. Based on his statements to Dr. Freedman, and on his history of crimes involving moral turpitude, the court does not credit R. B.'s testimony concerning his excuses for not CT Page 14643 completing programs, his attendance at AA/NA meetings, his understanding of the purpose of Dr. Freedman's evaluations, and the relationship between Rocha and himself.
C. Rocha and Her Progress In Foster Care
Ms. Walukiewicz described Rocha. The child was conceived in an abusive relationship where drugs played a significant role. Rocha's mother, J. H., was successful in rehabilitating herself and she has been reunified with others of her children who were not the offspring of R. B. However, since J. H. was not able to separate Rocha from the relationship which produced her, J. H. could not establish a bond with Rocha.
Rocha had just turned age three at the time of trial. She has been placed in a DCF-approved pre-adoptive home with a family who would like to adopt her if she is legally available to be adopted. The family consists of two foster parents who own their home. Rocha is happy and attached to her foster family, and also has access to an involved extended family, beyond the two foster parents. She is a very bright, independent, quiet young girl. At fifteen months of age it was perceived that she demonstrated some developmental delay, but she has made substantial progress since then.
She is bonded to her foster family. She calls her foster mother "Mommy-Dawn" and the foster father "Daddy-Mike." She called her previous foster parents "Mommy" and "Daddy."
Ms. Walukiewicz observed four visits between R. B. and Rocha over time. While at first Rocha was very uncomfortable, she has become more comfortable at the visits. She testified that she was not sure if Rocha knew who her father is.
ADJUDICATION
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." Conn. Gen. Stat. § 17a-112(c)(1). "Reasonable efforts means doing everything reasonable, not everything CT Page 14644 possible." In re Jessica B., 50 Conn. App. 554, 566 (1998).
In this case, the evidence is clear and convincing that DCF has made reasonable efforts to reunite Rocha with R. B. The record reflects that DCF apprised R. B. of what efforts were expected of him and that he knew what programs were available through the Department of Correction. His testimony reflected this knowledge. From his incarceration in 1996 through trial in 1999, he completed no recommended programs and provided no credible explanation for not having done so. Although he "could not avail himself of the programs normally available through [DCF] because of the restraints imposed by his incarceration, he is not excused from making use of available programs offered by the department of correction." In re Hector L.,53 Conn. App. 359, 372 (1999). Instead of doing so, R. B. apparently utilized the time available to occasionally threaten correctional personnel.
In addition, the record reflects that, even though R. B. was incarcerated, DCF maintained a regular schedule of visits for him with Rocha. Given the situation and circumstances where R. B. was incarcerated throughout Rocha's life, DCF made reasonable efforts to reunify him with her. He was unwilling to benefit from reunification efforts, except to receive visits.
B. Statutory Grounds
To prevail in a nonconsensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See Inre Michael B., 49 Conn. App. 510, 512 (1998); Conn. Gen. Stat § 17a-112(c)(3). In this adjudicatory phase, the court is limited to events preceding the filing of the petition or the latest amendment. See Practice Book § 33-3(a). The relevant date in this case is thus March 23, 1999.
DCF has alleged the ground of failure to rehabilitate as to R. B. The court finds that DCF has proven failure to rehabilitate against the father by clear and convincing evidence.
Failure to Rehabilitate
This ground for termination arises when "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding . . . has failed CT Page 14645 to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112(c)(3)(B). The court previously has found the child to have been "neglected," thus satisfying a statutory prerequisite.
The rest of the statute requires the court to find whether the facts encourage the belief that "such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112(c)(3)(B). This portion of the statute requires the court to analyze a parent's rehabilitation "as it relates to the needs of the particular child" and determine whether such rehabilitation is foreseeable "within a reasonable time." In reLuis C., 210 Conn. 157, 167 (1989); In re Hector L.,53 Conn. App. 359, 366-67 (1999).
At this adjudicatory phase, the ultimate issue is whether R. B. was better able to be a parent to Rocha when the petition was filed than at the time of her commitment. See In re Michael M.,29 Conn. App. 112, 126 (1992). Clearly and convincingly, the answer is "No."
R. B.'s circumstances did not meaningfully change between the February, 1997 neglect adjudication and the March, 1999 petition. He did not utilize that two year period to cooperate with DCF, even though he was imprisoned, to work toward his own rehabilitation for Rocha's benefit. All he did of a positive nature was receive her visits. Instead of working constructively, he remained a prison disciplinary problem. Contrary to his own interests, he refused to work with DCF, telling the Department's representative it was none of her business.
R. B.'s lack of effort to become a good parent while he was incarcerated does not warrant the belief that he could achieve a responsible role in Rocha's life within a reasonable time. His belated plan, offered at trial, for Rocha to live with him, and his mother, in seven or eight months, after he supposedly will have completed barber training, appears vague. Given his history and poor psychological prognosis, it is unlikely ever to come to fruition.
Rocha, at age three, has progressed well, although she has had asthma and a developmental delay. She requires a permanent, CT Page 14646 structured, caring and nurturing environment. R. B. cannot offer this to her now or within a reasonable time in the future. She has been in foster care for her entire life, now over three years. She should not have to languish there awaiting what would necessarily have to be a lengthy period of time to ascertain whether R. B. truly can be rehabilitated.
As the Appellate Court recently noted in In re Danuael D.,51 Conn. App. 829, 839 (1999), the critical issue is whether the parent "has gained the ability to care for the needs of the particular child at issue." At this point, it is evident that R. B. has a long way to go to be in a position to be a proper parent for any young child, let alone Rocha, who has never been in his care. Upon release, he will have to address many issues in order to have a stable enough existence just to keep out of prison. His track record, as he described it, is "terrible." He has failed to rehabilitate himself to the point that "within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112(c)(3)(B).
DISPOSITION OF THE TERMINATION PETITION
In the dispositional phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." Conn. Gen. Stat. § 17a-112(c)(2). The court can consider all events occurring through the close of the dispositional hearing. Practice Book § 33-5.
The Appellate Court has "consistently held that to allow a child to languish in foster care is not in the child's best interest." In re Drew R., 47 Conn. App. 124, 131 (1997). The best interest of Rocha clearly and convincingly favors termination of the parental rights of her father. Rocha is bonded to her foster parents, who are meeting her emotional needs, in a stable setting.
R. B. was essentially no more than a person to whom Rocha was brought to visit on an occasional basis. He bears the responsibility for his extensive criminal history which deprived Rocha and R. B. of the opportunity to establish an adequate parent-child relationship. Rocha was fortunate, having been born testing positive for cocaine, to be removed from a dangerous setting and to be placed in supportive foster care, where she is CT Page 14647 doing well. Now she is a part of an extended pre-adoptive family. To tear her from this family for the purpose of placing her with R. B. would be the height of unfairness. Such a result would once again place her at risk.
For good reason, Rocha has never been in R. B.'s care. Instead, due, in large part, to his failure to be available as a parent, others have had to meet her needs for her entire life. It is certainly not in her interest to begin anew at this point simply because R. B. would like the opportunity to be a parent now and thinks he would be ready to do so after several more months go by in Rocha's life.
In arriving at a decision, the court must consider and make written findings regarding seven factors set out in General Statutes § 17a-112(d). See In re Tabitha P.,39 Conn. App. 353, 362 (1995). A discussion of these factors follows.
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
Based on the foregoing discussion, the court finds that DCF provided foster care for Rocha. It scheduled visitation for R. B. and Rocha. Although R. B.'s incarceration prevented DCF from offering services to him directly, DCF did recommend Department of Correction programs for him. These programs (to address domestic violence, substance abuse, parenting) were relevant to his needs.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
Based on the foregoing discussion, the court finds that DCF provided visitation, but that there was no reasonable possibility of reunification as a result of R. B.'s incarcerations and failure to utilize programs. As previously stated, DCF's efforts were reasonable under the circumstances.
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order. CT Page 14648
Court-ordered Expectations were not entered until July 26, 1999, well after the petition was filed, and only about three months prior to trial. However, R. B. was previously and repeatedly made aware of DCF's reasonable expectations concerning program participation, as outlined above.
4) The feelings and emotional ties of the child with respect to her parents, any guardian of her person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
As stated above, Rocha is bonded to her foster family. While willing to visit with R. B., the court was not presented with any credible evidence that she has any particular feelings for or emotional ties to R. B. She was not bonded to her mother, who, as previously stated, consented to the termination of her parental rights.
5) The age of the child
Rocha is presently three years old.
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interests of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the court finds that R. B. has not made reasonable efforts to rehabilitate himself. He has made no effort to adjust his circumstances or conditions to make it in Rocha's best interests to be placed in his care in the foreseeable future. He has visited with her on a monthly basis while imprisoned. While he has been or will be released shortly, he will not then or in the near future be in a position to properly care for Rocha.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or CT Page 14649 the unreasonable act of any other person, or by economic circumstances of the parent.
R. B. did not face any unreasonable interference from J. H., the mother, from any third persons, or from economic circumstances. R. B.'s predicament is a consequence of his own actions and failures to act.
CONCLUSION
Based upon the foregoing findings, the court determines that it is in the best interest of Rocha B. for a termination of parental rights to enter with respect to the mother, J. H. and the father, R. B. Accordingly, the court hereby grants the petition to terminate the parental rights of J. H. and R. B. The court further orders that the Commissioner of DCF is appointed statutory parent of Rocha for the purpose of securing an adoptive family. If the foster family is willing to adopt, it is the court's direction that they receive first consideration. The Commissioner shall file with this court no later than ninety days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
It is so ordered.
BY THE COURT
ROBERT B. SHAPIRO JUDGE OF THE SUPERIOR COURT
CT Page 14649