Memorandum of Decision
On April 21, 1997, the Department of Children and Families (DCF) filed a neglect petition in this case concerning Lorenzo M., a minor boy. The court adjudicated Lorenzo neglected on July 31, 1998 and committed him to DCF custody for one year. On January 19, 1999, DCF filed a petition to terminate the parental rights of Lorenzo's mother, Lynn M. On July 30, 1999, as the original neglect commitment was about to lapse, DCF filed a second neglect petition. On November 30, December 1, 2, and 3, 1999, a consolidated trial of the termination petition and the second neglect petition took place in this court. For the reasons stated below, the court grants the termination petition. In view of this disposition, the court does not reach the neglect petition. CT Page 16407
 FACTS
The court finds the following facts and credits the following evidence.
A. The Mother
The mother was thirty-four years old at the time of trial. She had a normal childhood and graduated high school with honors. She was divorced with no children when she met Octavio V., who had his own children from a different relationship. Lorenzo was born out of wedlock to Lynn M. and Octavio V. on July 16, 1992. On April 28, 1993, a second boy, Antonio M., was born. Apparently during this time period, the mother authorized Lorenzo's half-brother to tie Lorenzo to a chair and gag him as a form of discipline. Sometime thereafter, Octavio V. left. In 1995, Octavio committed suicide in Puerto Rico.
The mother then had a relationship with Luis M. At some point Luis and the mother sexually abused Antonio. Luis and the mother abused Lorenzo physically, by hitting him with a belt or kicking him. Luis was also physically abusive to the mother. On April 14, 1997, the mother threw a shovel at Lorenzo, apparently because he refused to get ready for the school bus. The impact from the shovel, which may have been plastic or a toy, caused a two inch wound under Lorenzo's eye. The mother also stated, on this or other occasions, that she felt like she could kill Lorenzo.
As a result of these incidents, DCF obtained orders of temporary custody for both Antonio and Lorenzo and the mother was arrested for risk of injury to a minor.[2] On July 31, 1998, based on these events, the court terminated the mother's parental rights to Antonio and adjudicated Lorenzo neglected. The termination decision is currently on appeal.
The court first entered expectations concerning Lorenzo and Antonio in April, 1997. The expectations called for a psychological evaluation. The evaluation, which took place in June, 1997, found that the mother was inclined to poor judgment and that she did not show the ability to manage her children's behavior problems. The mother at one point during the evaluation yelled at Antonio to "stop lying." The evaluator recommended that the mother obtain personal counseling and parent training. CT Page 16408
DCF referred the mother to several programs for anger management, individual counseling, and parenting skills. The mother attended most of these classes in 1997, although her participation in individual counseling was less than regular.
On four occasions in 1997, Lorenzo's difficult behaviors caused the disruption of his foster placements, including one with his aunt. Visitation with Lorenzo and Antonio was supposed to take place at DCF offices based on a protective order entered against the mother in the criminal case. Lorenzo disclosed, however, that for a time he was seeing his mother at his aunt's and his mother's home. At the DCF visits, the mother often became angry at DCF in the children's presence or became angry at Lorenzo and Antonio themselves.
In November, 1997, Lorenzo was admitted to a hospital because his rage attacks and other uncontrollable behaviors posed a risk to his own safety. He remained in the hospital until January, 1998. The mother visited Lorenzo at the hospital but she would talk about his coming home, which would cause Lorenzo anxiety. Lorenzo's discharge diagnosis was oppositional defiant disorder, attention deficit hyperactivity disorder, reactive attachment disorder, and post traumatic stress disorder.[3]
After a short stay in respite care, Lorenzo went to the Wheeler Clinic, which is a residential facility. The clinic attempted to conduct family therapy sessions with both Lorenzo and his mother present. The mother, however, engaged in frequent outbursts, which triggered poor behaviors by Lorenzo. To address this problem, the clinic recommended that the mother meet with the therapist before each visit with Lorenzo. The mother objected to this format, stating that it was her right to behave the way she did.
The mother married Sergia H. in 1998.[4] In July, 1998, they had a baby girl, Nina. DCF referred the mother to parenting classes again. Although the mother stated that she did not see the need for such a course, she did attend. On October 29, 1998, the probate court granted DCF temporary custody of Nina. Nina has been placed with her maternal grandmother.
The mother failed to comply with an expectation entered by the court in October, 1998 that she obtain psychotherapy. The mother did continue individual counseling with her original therapist through November, 1998. She demonstrated some limited CT Page 16409 insight into her needs, although there were times when she would be adversarial or withdraw from therapy. Her discharge prognosis in January, 1999 was stated as worse than at the outset of treatment because of her anxiety and depression over the possibility of losing her three children.
In February, 1999, Lorenzo was placed in foster home of Kathy and Joseph M., which was specially licensed by Wheeler Clinic as a therapeutic foster home.[5] During a March, 1999 previsit meeting, Lorenzo's therapist stressed to the mother the importance of supporting his new placement. At the visitation session that immediately followed, however, the mother and Lorenzo engaged in a conversation in which the mother stated that they would be together soon. On the ride home with his new foster mother, Lorenzo had a severe tantrum and hit his foster mother with a seat belt. Lorenzo quieted down over the next few days. Based on the recommendation of Lorenzo's therapist, DCF suspended visitation.
In April, 1999, the mother sought therapy on her own due to marital problems and the disruption of her family. The therapist referred the mother to a hospital, which admitted her due to suicidal ideation. After her discharge, the mother continued with therapy through September, with some missed appointments. Her treating diagnosis was adjustment disorder with depressed mood.
The mother appeared for a psychiatric evaluation with Dr. Richard B. Sadler on October 15, 1999. Although Dr. Sadler made no formal diagnosis, he saw signs that the mother was suffering from a major depressive disorder. He found that the mother had failed to accept responsibility for, and was relatively unconcerned about, Lorenzo's profound difficulties. Dr. Sadler felt that, despite the provision of an array of services, the mother had not improved in her parenting techniques or abilities. He concluded that no counseling, medication, or psychiatric treatment was likely to change the deficits exhibited by the mother.
The mother testified at trial. She currently provides some babysitting and day care services. Her home appears neat and clean. After the court's earlier decision terminating her rights to Antonio and adjudicating Lorenzo neglected, however, she signed an application for state day care grants in which she falsely certified that she had no child protective services record. CT Page 16410
Lorenzo first started visiting with his current foster parents in October, 1998. He began living with them in February, 1999. The foster home consists of Kathy M., who is a retired nurse and now full-time mother, Joseph M, who works long hours at his own manufacturing company, and Christine, a ten year old adopted daughter.
At first, Lorenzo was an extremely difficult foster child for Kathy M. He would have rages and bed wetting episodes, destroy property, and pose discipline problems at school. Kathy M. approached this challenge by providing Lorenzo with a structured environment and a set routine. Lorenzo would get rewarded for a good day at school and lose privileges for acting out. If Lorenzo was particularly anxious, Kathy M. had him haul and make a stack of firewood, which seemed to have a calming effect.
Lorenzo is still a challenging child who receives therapy and medication. His current diagnosis is reactive attachment disorder and post traumatic stress disorder. But the therapy and the work of his foster parents have shown good results. Lorenzo is now much calmer. He is not wetting his bed. He is performing and behaving better at school and asks the teacher for a breather if he feels upset. He enjoys fishing with his foster father and other activities with his foster family and their extended family.
Lorenzo has not asked to visit his natural mother. Lorenzo's memories of his mother are negative. He mentions being punished with a belt, being tied up in a chair, or being hit with a shovel. Lorenzo has instead regularly asked his foster mother when he can become part of their family. He considers her to be his psychological mother. The foster parents and Lorenzo have formed a strong bond. The foster parents would like to adopt Lorenzo if he became available.
TERMINATION ADJUDICATION
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification CT Page 16411 efforts." General Statutes § 17a-112 (c)(1).[6] "Reasonable efforts means doing everything reasonable, not everything possible." In re Jessica B., 50 Conn. App. 554, 566, 718 A.2d 997
(1998).
In this case, DCF has provided Lorenzo specialized foster care, therapy, and visitation with his mother. For the mother, DCF has made referrals to psychological and psychiatric examinations, parenting classes, individual counseling, family counseling, and anger management classes, and facilitated visitation with Lorenzo. This evidence clearly and convincingly establishes that DCF has made reasonable efforts to reunify Lorenzo with his natural mother.
B. Statutory Grounds
To prevail in a nonconsensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See Inre Michael R., 49 Conn. App. 510, 512, 714 A.2d 1279, cert. denied, 247 Conn. 919, 722 A.2d 807 (1998); General Statutes 17a-112 (c)(3). In this adjudicatory phase, the court is ordinarily limited to events preceding the filing of the petition or the latest amendment. See Practice Book § 33-3(a).
The court dismissed the original termination petition in this case because of defective service. DCF refiled a petition on March 10, 1999 and served the mother on that day. The parties accordingly agree that the adjudicatory date in this case is March 10, 1999. DCF has alleged the grounds of failure to rehabilitate and acts of commission or omission against the mother. The court finds that DCF has proven both grounds by clear and convincing evidence.
1. Failure to Rehabilitate
The ground of failure to rehabilitate arises when "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding . . . has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes 17a-112 (c)(3)(B)(1). No dispute exists that the court adjudicated Lorenzo neglected on July 31, 1998, thus satisfying CT Page 16412 one element of the statute.
The rest of the statute requires the court to find whether the parent has achieved "such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes § 17a-112 (c)(3)(B). The statute requires the court to analyze the parents' rehabilitative status "as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable `within a reasonable time.'"In re Luis C., 210 Conn. 157, 167, 554 A.2d 722 (1989). The statute, however, does not require parents to "be able to assume full responsibility for [a] child, unaided by available support systems." In re Juvenile Appeal (84-3), 1 Conn. App. 463, 477,473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984). Because of the requirement that the court predict what will happen within a "reasonable time" after the filing of the termination petition, it is sensible to conclude that the court can consider not only the parents' conduct before the filing of the termination petition, but also the conduct occurring after it.
The evidence clearly and convincingly establishes that the mother failed to rehabilitate during the adjudicatory period. The mother attended parenting and anger management classes, but did not significantly benefit from them. Thus the mother persisted in engaging in outbursts at treatment workers or at her children, or in improperly telling Lorenzo that he would come home. She has not retained custody of any of her three natural children. The mother's compliance with individual counseling and psychotherapy was not as regular and, more importantly, her discharge diagnosis in January, 1999 was worse than at the outset of treatment. The mother also appears to have violated a protective order in 1997 by having unauthorized visits with Lorenzo. Finally, given Lorenzo's special needs and the mother's poor relationship with him, the mother did not rehabilitate "as it relates to the needs of the particular child." In re Luis C., supra, 210 Conn. 167. DCF has thus proven its first alleged statutory ground for termination.
3. Acts of Commission or Omission
General Statutes § 17a-112 (c)(3)(C) authorizes the termination of parental rights when the child "has been denied, CT Page 16413 by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well-being." This provision authorizes termination when "specific acts of parental commission or omission" have caused physical or emotional injury to the child. See In re Felicia D., 35 Conn. App. 490, 502,646 A.2d 862, cert. denied, 231 Conn. 931, 649 A.2d 253 (1994) (Internal quotation marks omitted).[7] The ground does not permit termination "based on speculation as to what acts may befall a child." In re Kelly S., 29 Conn. App. 600, 614, A.2d (1992).
In this case, the mother physically abused Lorenzo by hitting him with a belt, kicking him, throwing a shovel at him, and authorizing him to be tied to a chair and gagged. These incidents of physical abuse constituted "specific acts of parental commission" within the statute. See In re Felicia D., supra,35 Conn. App. 502. The throwing of the shovel resulted in a wound under Lorenzo's eye and thus caused physical injury. The pattern of physical abuse clearly led to Lorenzo's diagnosis of post traumatic stress disorder, which constitutes a serious emotional injury. Accordingly, DCF has proven the ground of acts of commission by clear and convincing evidence.
DISPOSITION
In the dispositional phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." General Statutes § 17a-112 (c)(2). The court can consider all events occurring through the close of the dispositional hearing. Practice Book § 33-5.
The best interest of Lorenzo M. clearly and convincingly requires termination of the parental rights of her mother. The mother physically abused Lorenzo while he was in her care and then failed to rehabilitate during the adjudicatory period while Lorenzo was in foster care. After DCF filed the termination petition, the mother was hospitalized for suicidal ideation and continues to show signs of depression. She still does not fully accept responsibility for or understand Lorenzo's difficulties. There was convincing expert testimony that, as of the present time, the mother still had not improved in her parenting abilities and would not likely improve in the future. The mother's own testimony was impaired by the fact that she had falsely certified an application for state day care grants. CT Page 16414
Lorenzo, in contrast, has made tremendous progress under the foster care of Kathy and Joseph M. Lorenzo arrived as a virtually unmanageable child. Through the steady hand and guidance of Kathy and Joseph M., Lorenzo has settled down. Lorenzo still has difficult moments, but his foster family, his teachers, and Lorenzo himself know how to deal with them. Lorenzo now appears as a happy boy, involved in a variety of wholesome family activities.
Lorenzo clearly does not wish to be reunited with his natural mother. He seeks instead to become part of the foster family, with whom he has become attached. The foster family, in turn, desires to adopt him. Given the structure, the normalcy, and the love that the foster family has provided Lorenzo, there is every reason why they should be allowed to adopt. Termination of the natural mother's parental rights will make this result possible.
In arriving at a decision, the court must consider and make written findings regarding seven factors set out in General Statutes § 17a-112 (e). See In re Tabitha P., 39 Conn. App. 353,362, 664 A.2d 1168 (1995). A discussion of these factors follows.
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
Based on the foregoing discussion, the court finds that DCF provided Lorenzo foster care, therapy, and visitation with his mother. DCF referred the mother to psychological and psychiatric evaluations, anger management, parenting, individual, and family counseling, and facilitated visitation. These services were relevant to the possible reunion of the child with the parent.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
Based on the foregoing discussion, the court finds that DCF offered the mother appropriate services and guidance, and sufficient time to permit family reunification.
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations CT Page 16415 under such order.
On April 28 and May 29, 1997 the court entered expectations for the mother to meet. On July 30, 1999 and August 11, 1999, the court approved certain preliminary specific steps with which the mother was instructed to comply. These expectations and specific steps were as follows: keep or (1) all appointments set by with DCF, (2) keep whereabouts known to DCF and your attorney, (3) visit the child as often as DCF permits, (4) participate in counseling (parenting, individual, anger management, and, as ordered on August 11, 1999, family counseling), 5) follow recommendations of service providers, 6) cooperate with in-home services, 7) sign releases as requested, 8) secure and maintain adequate housing and income, 9) no substance abuse, 10) no involvement with the criminal justice system, and 11) obtain sexual offender treatment if recommended by a psychiatrist. In addition, in October, 1998, the court in Nina s case instructed the mother to obtain psychotherapy. As detailed above, DCF substantially met its obligation to provide assistance. The mother's compliance with these expectations was satisfactory except for the critical areas of individual counseling and psychotherapy.
4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
As stated above, Lorenzo has negative memories of and feelings toward his natural mother. Lorenzo is closely bonded to his foster parents.
5) The age of the child.
Lorenzo is seven years old.
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with CT Page 16416 the guardian or other custodian of the child.
Based on the foregoing discussion, the court finds that the mother did not adjust her circumstances in time to make it in Lorenzo's best interest to return to the mother's home. The mother did maintain regular visitation, and sometimes had unauthorized visits with Lorenzo, but the mother's behavior during the visits was often inappropriate.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
As discussed above, the mother's difficulties do not stem from unreasonable interference of other persons or economic circumstances.
CONCLUSION
Based upon the foregoing findings, the court grants the petition to terminate the parental rights of Lorenzo M.'s natural mother, Lynn M. In view of this disposition, the court does not reach the neglect petition. The Commissioner of DCF is appointed statutory parent for Lorenzo for the purpose of securing an adoptive family. If the current foster parents are willing to adopt, it is the court's direction that they receive first consideration. The Commissioner shall file with this court no later than 90 days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
It is so ordered.
Carl J. Schuman Judge, Superior Court