MEMORANDUM OF DECISION
On November 16, 1998, the Department of Children and Families, hereafter "DCF", filed a petition for the termination of the parental rights of Waynette G. and Johnathan W. to their son, John W. The CT Page 5162 trial was held on March 20 and March 21, 2000. Johnathan W. attended the trial. Waynette did not attend, although her counsel defended her position. For the reasons set forth below, the court grants the termination petition on the grounds that Waynette abandoned this child and on the grounds that both parents have failed to rehabilitate so that either could parent this child. Connecticut General Statutes § 17a-112 (c)(3)(A) and (B).
From the evidence presented, the court finds the following facts:
 A. FACTS 1. Events prior to the neglect adjudication.
John lived with his mother and two sisters, one older and one younger until 1995, when he went to live with his father. He was then almost five years old. At that time, his mother was cocaine and heroin addicted and had left the girls with their grandmother, who could not care for them. In March, 1995, the two girls came into DCF care. John was able to remain with his father, who also was addicted and an abuser of illegal substances until March 5, 1997, when his father placed him with his aunt, Theresa J. In March, 1997, there had been a referral from John's school that the child was hungry and it was discovered that he and his father were homeless, due to Johnathan's drug use. On June 17, 1997, John was adjudicated neglected and committed to the care and custody of DCF and his commitment has been extended since that time. Unfortunately for John, his extended family also had problems with illegal drug use and he was removed from the care of his aunt on September 2, 1998. He has not returned to the care of his family in the years since.
2. Waynette G., the mother.
Waynette is now thirty-seven years old. She is herself the oldest. of four children and by all accounts she had a difficult childhood. She did not graduate from high school and was nineteen when her oldest child, Barbara Jean, was born. Her substance abuse history dates back some years as John was born in 1990 cocaine-addicted and with a congenital sexually transmitted disease. Many services were provided to the family at that time which Waynette did not use and after some time they were discontinued. By early 1995, as reported above, her cocaine and heroin use had increased to the point where she could no longer function as a parent and her two daughters were removed. On October 8, 1998 her rights to these two girls were terminated. The youngest child is also a biological child of Johnathan W. and his rights to her were terminated at that time as well. CT Page 5163
Court expectations were set for Waynette on July 13, 1995 for her two daughters. John remained at that time with his father and none were set then for him. Those expectations required her to submit to a drug and alcohol assessment and treatment as well as secure and maintain adequate housing.[2] There were two service agreements between DCF and Waynette, one on May, 1995 and the second on February 23, 1996 which continued the same requirements as the expectations. The DCF social worker testified that Waynette never completed any of the required assessments or drug and alcohol counseling. For substantial periods of time, her whereabouts were unknown to DCF. When the neglect petition was filed concerning John in 1997, Waynette did not attend court and so no additional expectations were set for her at that time. Nonetheless, from the evidence the court finds that the issues which prevented her from parenting her two daughters still were the issues confronting her two years later, when John was removed from his father's care. Those were her ongoing substance abuse, her homelessness, her criminal justice system involvement as well as her lack of regular contact with any of her children, due to her chaotic drug-addicted lifestyle.
During the time of DCF's involvement with Waynette, the services to which she was referred include the U-Conn. — Mt. Sinai Pediatric Clinic Child and Adolescent Protection Team as well as the Klingberg Family Center's Intensive Family Preservations services which provided in-home assistance to her when the children were still living with her. She was also referred to the Greater Hartford Multi-service Center for parenting education and skills training and the Alcohol and Drug Recovery Center for substance abuse evaluations and treatment as well as the Hartford Dispensary for methadone maintenance.
Waynette refused to attend many of the programs to which she was referred and never completed any drug programs. She was incarcerated in 1996 and in 1997 on charges of prostitution. The social worker testified that Waynette has had no contact with DCF since the fall of 1998. In addition, she did not contact DCF to inquire about her son, she did not send cards, gifts or letters and since the summer 1998, she has not visited with John. Prior to that time, she only had sporadic contact with her son. On June 9, 1998, the court found that further reunification efforts between Waynette and her son were no longer appropriate.
3. Johnathan W., the father.
Johnathan W. is now thirty-nine years old and remains incarcerated in connection with a conviction for possession of CT Page 5164 narcotics and a probation violation connected with that conviction. His release date is in April, 2001. He, like Waynette also did not graduate from high school, but has held various jobs. He had a difficult childhood and his own father abandoned the family when Johnathan was four. As noted, he struggled to be the primary caretaker for his son for two years from 1995 to 1997, when he was homeless and could not care for John. He, too, has serious problems with substance abuse, which DCF sought to address by various referrals. DCF also entered into two service agreements with Johnathan. The first was in January, 1997 and related to his younger daughter, then in DCF care, as well as John. That agreement required he participate in drug rehabilitation and random drug screens as well as to locate safe and adequate housing for himself and his son. The second agreement was signed in March, 1997 and required Johnathan to enter detox and a drug treatment program for his addictions and to address his housing and income difficulties. He did not manage to take any positive steps to confront either of these difficulties. He never completed any substance abuse programs.
During 1997 and 1998, Johnathan continued his drug use. He had unauthorized visits with his son at his aunt's house while high on drugs. He did not comply with any services to which DCF referred him, including drug assessment and treatment services. Johnathan's problems with the criminal justice system resulted in multiple arrests in 1997 and in 1998. He was convicted on charges of possession of narcotics in July, 1998. While on probation, he was again arrested in October, 1998 and received a combined sentence for a total period of incarceration of thirty months. He remains incarcerated at the present time.
The court-appointed psychologist, Steven M. Humphrey, evaluated Johnathan as well as his son and a paternal great aunt, Lilley A. on August 16, 1999. He prepared a written report concerning his findings and a summary of his opinions and testified at trial. In his opinion, Johnathan had not dealt with the problems concerning his addiction, although he was not using while incarcerated. Johnathan also did not feel he needed more counseling. He did not plan to attend any support group meetings, either NA or AA, to help him remain sober when released. In Dr. Humphreys' opinion, Johnathan did not have a realistic or appropriate plan for remaining drug-free. A counselor from the prison also testified that Johnathan had not taken advantage of those drug programs that were available to him in prison. Johnathan only attended the first introductory week-long program regarding substance abuse, Tier 1, and did not elect to continue with the additional programs available to him, even though those programs would have made him eligible for earlier release. Johnathan also did CT Page 5165 not attend any AA or NA group meeting while in prison. The court concludes from this testimony that Johnathan has not dealt with his drug addiction in any meaningful way. Although he is able to abstain while incarcerated, the likelihood of his remission continuing once released is very low. As noted by a drug counselor working with him in 1996, Johnathan is able to abstain for short periods of time, but "seemed likely to use intermittently in the future."[3], a prediction that has proven only too accurate in the years since.
Dr. Humphrey's diagnosis of Johnathan also does not bode well for the future. He testified that Johnathan W. "is emotionally volatile, has significant substance abuse issues, and is functioning with below average" cognitive abilities. He has a "personality disorder and there are anti-social elements to his presentation." He also suffers from a mood disorder. Dr. Humphrey noted that Johnathan "has difficulty in interpersonal relationships and is volatile in his reaction if he does not get what he wants. His intellectual level is compounded by these factors. These are not good signs." In his opinion, Johnathan is not in a position to raise this child, particularly in view of John's problems, which require a greater level of care than other children might. He testified that Johnathan's "personality issues, volatility, lack of a plan to address his substance abuse, his inability to accept responsibility for his criminal behavior and his deceptiveness in dealing with DCF all seemed to make it unlikely that he was capable of providing the care the child needs."
4. John W., the child.
John is almost ten years old and has suffered several disrupted placements. First, he lived with his mother and other siblings for five years. During that time he was witness to his mother's ever-increasing drug use. Next he lived with his father for two years and led a chaotic life due to his father's drug use. Next he stayed with a relative where the adults used drugs. Then, he was placed with his present foster mother, with whom he has resided since September, 1998. She is prepared to adopt John, should he become available for adoption.
Comparatively speaking, John has had a relatively short foster home stay. Nonetheless, John's life lacked stability and permanency for some considerable time prior to that placement. John also has some special needs in view of his turbulent early years. He has, as Dr. Humphrey noted, had;
 "experiences in the past, which made him emotionally CT Page 5166 vulnerable. He is likely to give in to pressure from adults, much more so than the average child. He has a need to please and impress the adults around him. He also has academic needs and is behind in his academic functioning."
While Dr. Humphrey did not evaluate John, he noted that this child needs to be in "an environment that addresses his emotional, academic and other needs. He needs stability and to attend school and have his physical needs met."
At present, John is in a normal classroom setting, but receives some special assistance. He has needed the patient help of his foster mother and his teachers to make progress in learning how to read. He is a year behind in school, now in the third grade. Since June, 1999, John has been receiving services from the Village for Families and Children and is placed in their extended day treatment program. There he receives individual, group and milieu therapies and was psychiatrically evaluated. The evaluator noted in her report of October 25, 1999 that John has been experiencing "anxiety, sadness, and anger; hearing voices that tell him to do bad things; nightmares; physical aggression, sexually reactive behavior, poor impulse control, decreased attention, enuresis and difficulty learning." His own statement to the evaluator was "I think about my mother......and my father in jail."[4] Dr. Mangini in her report noted that John:
 "presents with the strengths of resiliency, humor, an affectionate nature and playfulness. .... By the time he was seven, he had lost the care of his mother, his father and his aunt. He has been able to bond with his foster mother and has made significant progress in her home. He took a down hill turn when visits with his father resumed in the summer. His anxiety and agitation is associated with the psychological aftermath of trauma.."[5]
Her treatment recommendations were for continued support by the extended day program that the Village presently offers this child.
5. Paternal Great Aunt, Lilley A.
Johnathan W. cannot care for his son while he is incarcerated. Some time ago, he suggested that his great aunt, Lilley A. be considered as a placement resource for John. Ms. A. also contacted DCF to indicate her willingness to have John live with her. For reasons that the court cannot entirely credit, DCF did not timely CT Page 5167 investigate her home and has only slowly begun to offer her contact with John. Dr. Humphrey was able to evaluate an interactional session between Lilley and John in August, 1999. He testified that he noted that John was happy and animated during the interaction with his great aunt. He noted that Ms. A. could be considered a foster care placement for this child. In observing both the foster mother and Ms. A. on that date, he noted that the paternal great-aunt was more sensitive and attentive to John's emotional needs. His foster mother was clearly focused on helping him with his intellectual needs and spent much of the session working on materials to aid him.
Dr. Humphrey was of the opinion that John also had a lively and strong emotional attachment to his father. He thought that, although John needs permanency, cutting off all contact in the future with his father would be devastating to John. It would create an additional loss John would need to deal with in his short life, already replete with major personal losses. In his opinion, the best plan to reconcile the seemingly two contradictory goals of securing permanency and stability for John and still maintaining contact with his father was John's placement with his great aunt. The only concern he had with this plan was whether or not Ms. A. could properly supervise and restrict Jonathan's access to his son upon his release from prison. His recommendation was to place the child with his great-aunt and then monitor her ability to do this.[6] Such an attempt, in his belief, was the only way to determine if she had the capability of protecting John when required.
Ms. A. attended the trial and testified regarding her contacts with DCF and her efforts to be considered a placement resource. She is fully employed, in good health and resides in a home with more than adequate room for her grand nephew. She presently takes care of her own grandson, another ten-year-old boy who knows John. She testified that she had contact with John since he was a baby. She also would be willing to adopt him, should he be free for adoption.
DCF's reluctance to involve her in John's life is ostensibly connected to her failure to call the authorities after hearing at a family event that her niece, with whom John was then placed, was using drugs. DCF believed she had a duty to report this to the authorities and had criticized her for failing to do so. The court cannot credit this claim. A casual comment overheard at a family party without any direct observation is not a reason to believe such report should be made. There were other adults more involved in the child's life who had that duty, but Ms. A., in the court's view, was not one of those people. Ms. A. stated she had not then considered that she herself could be a resource for this child. CT Page 5168
When Ms. A. began to inquire about John in 1998, it took many phone calls to begin the contacts with DCF. It was not until 1999 that DCF did a home visit. After that visit, Ms. A. thought that John would come to live with her in the fall of 1999 and was surprised when nothing at all happened. On August 9, 1999, when Dr. Humphrey's report was completed, he recommended that there be visitation between John and his great aunt, based on the quality of the relationship he saw between them. It was not until November, 1999 that such visitation was offered. Ms. A. testified that she made two visits to the foster home in December and early January, at which point she stopped. She stated that visits in the foster home were uncomfortable and she did not understand why they were required to be limited in that fashion.
DCF's present plan for John is not yet finalized. The social worker testified that they are considering both Ms. A.'s home and John's present foster home as permanent homes for him. In the court's view, in view of DCF's lack of effort with Ms. A., this claim is not credible. The court observed substantial resistance by DCF to the recommendations made by Dr. Humphrey, which DCF has done little to implement.
 B. ADJUDICATORY FINDINGS 1. Reasonable Reunification Efforts.
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts . . . provided that this finding is not required if the court has determined at a hearing . . . that such efforts are not appropriate." Connecticut General Statutes § 17a-112 (c)(1). Such findings were made for both Waynette G. and Johnathan W. on June 9, 1998. The termination petition also alleges that reasonable efforts were made and that neither Waynette nor Johnathan were able to benefit from those efforts.
Connecticut General Statutes § 17a-112 (a)(1) does not contain within it a definition of the term "reasonable." The Connecticut Court has held that "reasonable" is a term which varies according to its context and is synonymous with equitable, fair, and just, citing Webster's New International Dictionary (2nd Ed.). State v. Antrim,185 Conn. 118, 122 (1981) (citations omitted). More recently, in the termination of parental rights context, the Appellate Court stated CT Page 5169 that reasonable efforts means doing everything reasonable, not everything possible." In re Savanna M., 55 Conn. App. 807, 812-813, ___ A.2d ___ (1999) (citations omitted); In re Jessica B.,50 Conn. App. 554, 566, 718 A.2d 997 (1998).
DCF took such reasonable steps in this case. The court finds, by the clear and convincing evidence, that DCF made reasonable reunification efforts until 1998. The court further concludes that those reasonable efforts continued for a long period of time with Waynette, even after it was clear she was not benefiting from them. By the date of the filing of the termination petition, Waynette's whereabouts were unknown and notice to her was by publication. Johnathan has also received many referrals and assistance in parenting and has not benefited from the services to which he was referred. The court concludes from the clear and convincing evidence that neither Waynette R. nor Johnathan were able to benefit from reunification services.
2. Waynette G.'s Abandonment of John and her Failure to Rehabilitate.
The termination petition alleges that Waynette has abandoned her son. "Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare." In re Juvenile Appeal (Docket No. 9489), 183 Conn. 11, 14,438 A.2d 801 (1981). For a substantial period of time, Waynette has not visited with John, has sent no cards, letters or gifts and has not inquired about his welfare. The clear and convincing evidence demonstrates that Waynette has abandoned her son.
On June 13, 1997, John was adjudicated neglected and committed to the care and custody of DCF for a period of twelve months. His commitment has been extended since that time. The court further finds, by clear and convincing evidence, that as of the date of the filing of the termination petition on November 6, 1998, Waynette had not achieved such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, she could assume a responsible position in his life. Connecticut General Statutes § 17a-112 (c)(3)(B). "Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent." In re Migdalia M., 6 Conn. App. 194, 203,504 A.2d 532 (1986), see also In re Juvenile Appeal,1 Conn. App. 463, 477, 473 A.2d 795 (1984). The court concludes Waynette's lack of rehabilitation continued even after the filing of the termination petition and that there is no prospect that she will CT Page 5170 be rehabilitated within the foreseeable future.
The statutory framework requires the court to analyze the parent's rehabilitation "as it relates to the needs of the particular child" and consider if such rehabilitation is foreseeable "within a reasonable time." In re Luis C., 210 Conn. 157, 1167, 554 A.2d 722
(1989), In re Hector L., 53 Conn. App. 359, 366-367, ___ A.2d ___ (1999). Because of this requirement that the court predict what may happen within a "reasonable time" after the filing of the termination petition, the court must consider not only Waynette's conduct prior to the filing of those petitions, but also her conduct after that time. In this case, this was a period of slightly more than one year. Nothing has changed with respect to Waynette's conduct in the time since the filing of the termination petition. There has been no rehabilitation, the court concludes. The court therefore finds, from the clear and convincing evidence, that Waynette cannot be rehabilitated as a parent of this child within the reasonably foreseeable future, consistent with his needs for permanency.
3. Johnathan W.'s abandonment of John and his failure to rehabilitate.
The court also finds that there is some evidence that as of November 16, 1998, Johnathan had abandoned his son in the legal meaning of that term. He has not contacted DCF to inquire about the child's welfare, he has not sent cards, gifts or letters and generally has not done what he could to consider the welfare of this child. Nonetheless, Johnathan is concerned about John and wants to maintain contact with him. He has not disappeared completely out of this child's life and ignored him, as Waynette has done. The steps he has taken, even though limited by his imprisonment, fall far short of what he could have done, under the circumstances. Nonetheless, the court concludes that this ground was not proven by clear and convincing evidence and dismisses this claim, which the petitioner did not press at trial.
More compelling, however, is the clear and convincing evidence of Johnathan's failure to rehabilitate so that he could parent this child. Fundamental to such rehabilitation would be any meaningful steps to address his substance abuse, which Johnathan has not taken. He did not complete even those programs available to him while incarcerated and has no appreciation for the seriousness of the task facing him, once released. Given the testimony of the social worker and Dr. Humphrey, the court concludes that there is little likelihood that Johnathan can rehabilitate to parent John within a reasonable time in Johns' life, as he is almost ten years old. CT Page 5171
 C. REQUIRED FINDINGS
The court makes the following factual findings required by Connecticut General Statutes § 17a-112 (e):
(1) Appropriate and timely services were provided by DCF to the family. These include services to benefit Johnathan, referrals for both Waynette and Johnathan to deal with issues of parenting, housing and substance abuse. DCF has also provided visitation, transportation and case management services.
(2) As previously noted, the court finds by clear and convincing evidence that DCF made reasonable efforts to reunify the family.
(3) The terms of any applicable orders entered into and agreed to by any individual or agency and the extent of fulfillment of those obligations. The court finds that reasonable court expectations and service agreements were set for Waynette and she was not able to even minimally fulfill them. Service agreements were made with Johnathan, which required him to address his issues of substance abuse, parenting and lack of housing. He, too, was unable to make progress on the goals set for him.
(4) The feelings and emotional ties of the child with respect to the parent, any guardian of the person and any person who has exercised physical care, custody and control of the child for at least one year and with whom the child has developed significant emotional ties. John has begun to settle into his foster home. His foster mother has worked hard to stabilize him and he has made progress there. He no longer inquires about his mother, but remains attached and concerned about his father. He is connected to his great-aunt, Lilley A.
(5) Finding regarding the age of the child: John W. was born on June 28, 1990 and will soon be ten years old.
(6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the child to return him to their home in the foreseeable future and (A) the extent to which the parents have maintained contact with the child as part of an effort to reunite the child with them, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the child. As detailed above, the court finds that neither of the parents was able to make the changes necessary to accommodate the care and CT Page 5172 nurturing of this child.
(7) Finding regarding the extent to which a parent has been prevented from maintaining a reasonable relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent. No such conduct is noted. DCF has taken many steps for many years to encourage Waynette to have a meaningful relationship with John and to rehabilitate herself, which she has been unable to accomplish. Many steps were also taken to assist Johnathan.
 D. DISPOSITION
The court concludes, from the clear and convincing evidence, that neither of the parents can care for John in the foreseeable future. It is in John's best interests to have permanency and stability in his life. The court further finds that adoption by a family that understands and can accommodate his special needs is the avenue most likely to accomplish this result for John.
While the court has detailed its concerns regarding the steps DCF has taken with respect to John's great-aunt, it is not the court's role to determine the permanent placement for John as that will await the future and the actions of a probate court. Nonetheless, the court directs DCF to actively review the available relative resource, consistent with John's best interests and guided by the therapists who are supporting this child. DCF has stated it is exploring this plan. That exploration should include visitation between John and Lilly A., which may be supervised initially, but which if appropriate, should progress to unsupervised contact in the near future. Such visitation should not be at the foster mother's home. After a suitable interval, the court directs that DCF carry out an appropriate professional assessment of each of the available homes for John. Such an assessment is required to ensure that John's best interests are served, bearing in mind the psychologist's assessment of the importance of his connection to his family of origin.
The court, finds from the clear and convincing evidence, that John W. requires a permanent home in the near future. This court holds that such a home is in his best interests and that his parents cannot supply this to him. The court therefore terminates the rights of Waynette G. and Johnathan W. to John W. in order to provide John with permanency. The court hereby appoints the Commissioner of the Department of Children and Families as John's statutory parent. The court further orders that a permanency plan for John be submitted within sixty days, consistent with the court's suggested interim CT Page 5173 steps. A review plan for John shall be filed in accordance with state and federal law.
____________________ Barbara M. Quinn, Presiding Judge Child Protection Session